Justice KENNEDYdelivered the opinion of the Court.
A delicate subject lies in the background of this case. That subject is Jerusalem. Questions touching upon the history of the ancient city and its present legal and international status are among the most difficult and complex in international affairs. In our constitutional system these matters are committed to the Legislature and the Executive, not the Judiciary. As a result, in this opinion the Court does no more, and must do no more, than note the existence of international debate and tensions respecting Jerusalem. Those matters are for Congress and the President to discuss and consider as they seek to shape the Nation's foreign policies.
The Court addresses two questions to resolve the interbranch dispute now before it. First, it must determine whether the President has the exclusive power to grant formal recognition to a foreign sovereign. Second, if he has that power, the Court must determine whether Congress can command the President and his Secretary of State to issue a formal statement that contradicts the earlier recognition. The statement in question here is a congressional mandate that allows a United States citizen born in Jerusalem to direct the President and Secretary of State, when issuing his passport, to state that his place of birth is "Israel."
I
A
Jerusalem's political standing has long been, and remains, one of the most sensitive issues in American foreign policy, and indeed it is one of the most delicate issues in current international affairs. In 1948, President Truman formally recognized Israel in a signed statement of "recognition." See Statement by the President Announcing Recognition of the State of Israel, Public Papers of the Presidents, May 14, 1948, p. 258 (1964). That statement did not recognize Israeli sovereignty over Jerusalem. Over the last 60 years, various actors have sought to assert full or partial sovereignty over the city, including Israel, Jordan, and the Palestinians. Yet, in contrast to a consistent policy of formal recognition of Israel, neither President Truman nor any later United States President has issued an official statement or declaration acknowledging any country's sovereignty over Jerusalem. Instead, the Executive Branch has maintained that " 'the status of Jerusalem ... should be decided not unilaterally but in consultation with all concerned.' " United Nations Gen. Assembly Official Records, 5th Emergency Sess., 1554th Plenary Meetings, United Nations Doc. No. 1 A/PV.1554, p. 10 (July 14, 1967); see, e.g.,Remarks by President Obama in Address to the United Nations Gen. Assembly (Sept. 21, 2011), 2011 Daily Comp. of Pres. Doc. No. 00661, p. 4 ("Ultimately, it is the Israelis and the Palestinians, not us, who must reach agreement on the issues that divide them," including "Jerusalem"). In a letter to Congress then-Secretary of State Warren Christopher expressed the Executive's concern that "[t]here is no issue related to the Arab-Israeli negotiations that is more sensitive *2082 than Jerusalem." See 141 Cong. Rec. 28967 (1995) (letter to Robert Dole, Majority Leader, (June 20, 1995)). He further noted the Executive's opinion that "any effort ... to bring it to the forefront" could be "very damaging to the success of the peace process." Ibid.
The President's position on Jerusalem is reflected in State Department policy regarding passports and consular reports of birth abroad. Understanding that passports will be construed as reflections of American policy, the State Department's Foreign Affairs Manual instructs its employees, in general, to record the place of birth on a passport as the "country [having] present sovereignty over the actual area of birth." Dept. of State, 7 Foreign Affairs Manual (FAM) § 1383.4 (1987). If a citizen objects to the country listed as sovereign by the State Department, he or she may list the city or town of birth rather than the country. See id.,§ 1383.6. The FAM, however, does not allow citizens to list a sovereign that conflicts with Executive Branch policy. See generally id.,§ 1383. Because the United States does not recognize any country as having sovereignty over Jerusalem, the FAM instructs employees to record the place of birth for citizens born there as "Jerusalem." Id.,§ 1383.5-6 (emphasis deleted).
In 2002, Congress passed the Act at issue here, the Foreign Relations Authorization Act, Fiscal Year 2003, 116 Stat. 1350. Section 214 of the Act is titled "United States Policy with Respect to Jerusalem as the Capital of Israel." Id.,at 1365. The subsection that lies at the heart of this case, § 214(d), addresses passports. That subsection seeks to override the FAM by allowing citizens born in Jerusalem to list their place of birth as "Israel." Titled "Record of Place of Birth as Israel for Passport Purposes," § 214(d) states "[f]or purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." Id.,at 1366.
When he signed the Act into law, President George W. Bush issued a statement declaring his position that § 214 would, "if construed as mandatory rather than advisory, impermissibly interfere with the President's constitutional authority to formulate the position of the United States, speak for the Nation in international affairs, and determine the terms on which recognition is given to foreign states." Statement on Signing the Foreign Relations Authorization Act, Fiscal Year 2003, Public Papers of the Presidents, George W. Bush, Vol. 2, Sept. 30, 2002, p. 1698 (2005). The President concluded, "U.S. policy regarding Jerusalem has not changed." Ibid.
Some parties were not reassured by the President's statement. A cable from the United States Consulate in Jerusalem noted that the Palestine Liberation Organization Executive Committee, Fatah Central Committee, and the Palestinian Authority Cabinet had all issued statements claiming that the Act " 'undermines the role of the U.S. as a sponsor of the peace process.' " App. 231. In the Gaza Strip and elsewhere residents marched in protest. See The Associated Press and Reuters, Palestinians Stone Police Guarding Western Wall, The Seattle Times, Oct. 5, 2002, p. A7.
In response the Secretary of State advised diplomats to express their understanding of "Jerusalem's importance to both sides and to many others around the world." App. 228. He noted his belief that America's "policy towards Jerusalem" had not changed. Ibid.
*2083 B
In 2002, petitioner Menachem Binyamin Zivotofsky was born to United States citizens living in Jerusalem. App. 24-25. In December 2002, Zivotofsky's mother visited the American Embassy in Tel Aviv to request both a passport and a consular report of birth abroad for her son. Id.,at 25. She asked that his place of birth be listed as " 'Jerusalem, Israel.' " Ibid.The Embassy clerks explained that, pursuant to State Department policy, the passport would list only "Jerusalem." Ibid.Zivotofsky's parents objected and, as his guardians, brought suit on his behalf in the United States District Court for the District of Columbia, seeking to enforce § 214(d).
Pursuant to § 214(d), Zivotofsky claims the right to have "Israel" recorded as his place of birth in his passport. See Zivotofsky v. Clinton,566 U.S. ----, ----, 132 S.Ct. 1421, 1426, 182 L.Ed.2d 423 (2012)("[W]hile Zivotofsky had originally asked that 'Jerusalem, Israel' be recorded on his passport, '[b]oth sides agree that the question now is whether § 214(d) entitles [him] to have just "Israel" listed' "). The arguments in Zivotofsky's brief center on his passport claim, as opposed to the consular report of birth abroad. Indeed, in the court below, Zivotofsky waived any argument that his consular report of birth abroad should be treated differently than his passport. Zivotofsky v. Secretary of State,725 F.3d 197, 203, n. 3 (C.A.D.C.2013). He has also waived the issue here by failing to differentiate between the two documents. As a result, the Court addresses Zivotofsky's passport arguments and need not engage in a separate analysis of the validity of § 214(d) as applied to consular reports of birth abroad.
After Zivotofsky brought suit, the District Court dismissed his case, reasoning that it presented a nonjusticiable political question and that Zivotofsky lacked standing. App. 28-39. The Court of Appeals for the District of Columbia Circuit reversed on the standing issue, Zivotofsky v. Secretary of State,444 F.3d 614, 617-619 (2006), but later affirmed the District Court's political question determination. See Zivotofsky v. Secretary of State,571 F.3d 1227, 1228 (2009).
This Court granted certiorari, vacated the judgment, and remanded the case. Whether § 214(d) is constitutional, the Court held, is not a question reserved for the political branches. In reference to Zivotofsky's claim the Court observed "the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional"-not whether Jerusalem is, in fact, part of Israel. Zivotofsky v. Clinton, supra,at ----, 132 S.Ct., at 1427.
On remand the Court of Appeals held the statute unconstitutional. It determined that "the President exclusively holds the power to determine whether to recognize a foreign sovereign," 725 F.3d, at 214, and that "section 214(d) directly contradicts a carefully considered exercise of the Executive branch's recognition power." Id.,at 217.
This Court again granted certiorari. 572 U.S. ----, 134 S.Ct. 1873, 188 L.Ed.2d 910 (2014).
II
In considering claims of Presidential power this Court refers to Justice Jackson's familiar tripartite framework from Youngstown Sheet & Tube Co. v. Sawyer,343 U.S. 579, 635-638, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)(concurring opinion). The framework divides exercises of Presidential power into three categories: First, when "the President acts pursuant to an express or implied authorization of *2084 Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." Id.,at 635, 72 S.Ct. 863. Second, "in absence of either a congressional grant or denial of authority" there is a "zone of twilight in which he and Congress may have concurrent authority," and where "congressional inertia, indifference or quiescence may" invite the exercise of executive power. Id.,at 637, 72 S.Ct. 863. Finally, when "the President takes measures incompatible with the expressed or implied will of Congress ... he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Ibid.To succeed in this third category, the President's asserted power must be both "exclusive" and "conclusive" on the issue. Id.,at 637-638, 72 S.Ct. 863.
In this case the Secretary contends that § 214(d) infringes on the President's exclusive recognition power by "requiring the President to contradict his recognition position regarding Jerusalem in official communications with foreign sovereigns." Brief for Respondent 48. In so doing the Secretary acknowledges the President's power is "at its lowest ebb." Youngstown,343 U.S., at 637, 72 S.Ct. 863. Because the President's refusal to implement § 214(d) falls into Justice Jackson's third category, his claim must be "scrutinized with caution," and he may rely solely on powers the Constitution grants to him alone. Id.,at 638, 72 S.Ct. 863.
To determine whether the President possesses the exclusive power of recognition the Court examines the Constitution's text and structure, as well as precedent and history bearing on the question.
A
Recognition is a "formal acknowledgement" that a particular "entity possesses the qualifications for statehood" or "that a particular regime is the effective government of a state." Restatement (Third) of Foreign Relations Law of the United States § 203, Comment a,p. 84 (1986). It may also involve the determination of a state's territorial bounds. See 2 M. Whiteman, Digest of International Law § 1, p. 1 (1963) (Whiteman) ("[S]tates may recognize or decline to recognize territory as belonging to, or under the sovereignty of, or having been acquired or lost by, other states"). Recognition is often effected by an express "written or oral declaration." 1 J. Moore, Digest of International Law § 27, p. 73 (1906) (Moore). It may also be implied-for example, by concluding a bilateral treaty or by sending or receiving diplomatic agents. Ibid.; I. Brownlie, Principles of Public International Law 93 (7th ed. 2008) (Brownlie).
Legal consequences follow formal recognition. Recognized sovereigns may sue in United States courts, see Guaranty Trust Co. v. United States,304 U.S. 126, 137, 58 S.Ct. 785, 82 L.Ed. 1224 (1938), and may benefit from sovereign immunity when they are sued, see National City Bank of N.Y. v. Republic of China,348 U.S. 356, 358-359, 75 S.Ct. 423, 99 L.Ed. 389 (1955). The actions of a recognized sovereign committed within its own territory also receive deference in domestic courts under the act of state doctrine. See Oetjen v. Central Leather Co.,246 U.S. 297, 302-303, 38 S.Ct. 309, 62 L.Ed. 726 (1918). Recognition at international law, furthermore, is a precondition of regular diplomatic relations. 1 Moore § 27, at 72. Recognition is thus "useful, even necessary," to the existence of a state. Ibid.
Despite the importance of the recognition power in foreign relations, the Constitution does not use the term "recognition," either in Article II or elsewhere. The Secretary asserts that the President exercises *2085 the recognition power based on the Reception Clause, which directs that the President "shall receive Ambassadors and other public Ministers." Art. II, § 3. As Zivotofsky notes, the Reception Clause received little attention at the Constitutional Convention. See Reinstein, Recognition: A Case Study on the Original Understanding of Executive Power, 45 U. Rich. L. Rev. 801, 860-862 (2011). In fact, during the ratification debates, Alexander Hamilton claimed that the power to receive ambassadors was "more a matter of dignity than of authority," a ministerial duty largely "without consequence." The Federalist No. 69, p. 420 (C. Rossiter ed. 1961).
At the time of the founding, however, prominent international scholars suggested that receiving an ambassador was tantamount to recognizing the sovereignty of the sending state. See E. de Vattel, The Law of Nations § 78, p. 461 (1758) (J. Chitty ed. 1853) ("[E]very state, truly possessed of sovereignty, has a right to send ambassadors" and "to contest their right in this instance" is equivalent to "contesting their sovereign dignity"); see also 2 C. van Bynkershoek, On Questions of Public Law 156-157 (1737) (T. Frank ed. 1930) ("Among writers on public law it is usually agreed that only a sovereign power has a right to send ambassadors"); 2 H. Grotius, On the Law of War and Peace 440-441 (1625) (F. Kelsey ed. 1925) (discussing the duty to admit ambassadors of sovereign powers). It is a logical and proper inference, then, that a Clause directing the President alone to receive ambassadors would be understood to acknowledge his power to recognize other nations.
This in fact occurred early in the Nation's history when President Washington recognized the French Revolutionary Government by receiving its ambassador. See A. Hamilton, Pacificus No. 1, in The Letters of Pacificus and Helvidius 5, 13-14 (1845) (reprint 1976) (President "acknowledged the republic of France, by the reception of its minister"). After this incident the import of the Reception Clause became clear-causing Hamilton to change his earlier view. He wrote that the Reception Clause "includes th[e power] of judging, in the case of a revolution of government in a foreign country, whether the new rulers are competent organs of the national will, and ought to be recognised, or not." See id.,at 12; see also 3 J. Story, Commentaries on the Constitution of the United States § 1560, p. 416 (1833) ("If the executive receives an ambassador, or other minister, as the representative of a new nation ... it is an acknowledgment of the sovereign authority de factoof such new nation, or party"). As a result, the Reception Clause provides support, although not the sole authority, for the President's power to recognize other nations.
The inference that the President exercises the recognition power is further supported by his additional Article II powers. It is for the President, "by and with the Advice and Consent of the Senate," to "make Treaties, provided two thirds of the Senators present concur." Art. II, § 2, cl. 2. In addition, "he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors" as well as "other public Ministers and Consuls." Ibid.
As a matter of constitutional structure, these additional powers give the President control over recognition decisions. At international law, recognition may be effected by different means, but each means is dependent upon Presidential power. In addition to receiving an ambassador, recognition may occur on "the conclusion of a bilateral treaty," or the "formal initiation of diplomatic relations," including the dispatch of an ambassador. Brownlie 93; see *2086 also 1 Moore § 27, at 73. The President has the sole power to negotiate treaties, see United States v. Curtiss-Wright Export Corp.,299 U.S. 304, 319, 57 S.Ct. 216, 81 L.Ed. 255 (1936), and the Senate may not conclude or ratify a treaty without Presidential action. The President, too, nominates the Nation's ambassadors and dispatches other diplomatic agents. Congress may not send an ambassador without his involvement. Beyond that, the President himself has the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers. The Constitution thus assigns the President means to effect recognition on his own initiative. Congress, by contrast, has no constitutional power that would enable it to initiate diplomatic relations with a foreign nation. Because these specific Clauses confer the recognition power on the President, the Court need not consider whether or to what extent the Vesting Clause, which provides that the "executive Power" shall be vested in the President, provides further support for the President's action here. Art. II, § 1, cl. 1.
The text and structure of the Constitution grant the President the power to recognize foreign nations and governments. The question then becomes whether that power is exclusive. The various ways in which the President may unilaterally effect recognition-and the lack of any similar power vested in Congress-suggest that it is. So, too, do functional considerations. Put simply, the Nation must have a single policy regarding which governments are legitimate in the eyes of the United States and which are not. Foreign countries need to know, before entering into diplomatic relations or commerce with the United States, whether their ambassadors will be received; whether their officials will be immune from suit in federal court; and whether they may initiate lawsuits here to vindicate their rights. These assurances cannot be equivocal.
Recognition is a topic on which the Nation must " 'speak ... with one voice.' " American Ins. Assn. v. Garamendi,539 U.S. 396, 424, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003)(quoting Crosby v. National Foreign Trade Council,530 U.S. 363, 381, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)). That voice must be the President's. Between the two political branches, only the Executive has the characteristic of unity at all times. And with unity comes the ability to exercise, to a greater degree, "[d]ecision, activity, secrecy, and dispatch." The Federalist No. 70, p. 424 (A. Hamilton). The President is capable, in ways Congress is not, of engaging in the delicate and often secret diplomatic contacts that may lead to a decision on recognition. See, e.g.,United States v. Pink,315 U.S. 203, 229, 62 S.Ct. 552, 86 L.Ed. 796 (1942). He is also better positioned to take the decisive, unequivocal action necessary to recognize other states at international law. 1 Oppenheim's International Law § 50, p. 169 (R. Jennings & A. Watts eds., 9th ed. 1992) (act of recognition must "leave no doubt as to the intention to grant it"). These qualities explain why the Framers listed the traditional avenues of recognition-receiving ambassadors, making treaties, and sending ambassadors-as among the President's Article II powers.
As described in more detail below, the President since the founding has exercised this unilateral power to recognize new states-and the Court has endorsed the practice. See Banco Nacional de Cuba v. Sabbatino,376 U.S. 398, 410, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); Pink, supra,at 229, 62 S.Ct. 552; Williams v. Suffolk Ins. Co.,13 Pet. 415, 420, 10 L.Ed. 226 (1839). Texts and treatises on international law treat the President's word as the final word on recognition. See, e.g., *2087 Restatement (Third) of Foreign Relations Law § 204, at 89("Under the Constitution of the United States the President has exclusive authority to recognize or not to recognize a foreign state or government"); see also L. Henkin, Foreign Affairs and the U.S. Constitution 43 (2d ed. 1996) ("It is no longer questioned that the President does not merely perform the ceremony of receiving foreign ambassadors but also determines whether the United States should recognize or refuse to recognize a foreign government"). In light of this authority all six judges who considered this case in the Court of Appeals agreed that the President holds the exclusive recognition power. See 725 F.3d, at 214("[W]e conclude that the President exclusively holds the power to determine whether to recognize a foreign sovereign"); Zivotofsky,571 F.3d, at 1231("That this power belongs solely to the President has been clear from the earliest days of the Republic"); id.,at 1240(Edwards, J., concurring) ("The Executive has exclusive and unreviewable authority to recognize foreign sovereigns").
It remains true, of course, that many decisions affecting foreign relations-including decisions that may determine the course of our relations with recognized countries-require congressional action. Congress may "regulate Commerce with foreign Nations," "establish an uniform Rule of Naturalization," "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," "declare War," "grant Letters of Marque and Reprisal," and "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const., Art. I, § 8. In addition, the President cannot make a treaty or appoint an ambassador without the approval of the Senate.Art. II, § 2, cl. 2. The President, furthermore, could not build an American Embassy abroad without congressional appropriation of the necessary funds. Art. I, § 8, cl. 1. Under basic separation-of-powers principles, it is for the Congress to enact the laws, including "all Laws which shall be necessary and proper for carrying into Execution" the powers of the Federal Government. § 8, cl. 18.
In foreign affairs, as in the domestic realm, the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity." Youngstown,343 U.S., at 635, 72 S.Ct. 863(Jackson, J., concurring). Although the President alone effects the formal act of recognition, Congress' powers, and its central role in making laws, give it substantial authority regarding many of the policy determinations that precede and follow the act of recognition itself. If Congress disagrees with the President's recognition policy, there may be consequences. Formal recognition may seem a hollow act if it is not accompanied by the dispatch of an ambassador, the easing of trade restrictions, and the conclusion of treaties. And those decisions require action by the Senate or the whole Congress.
In practice, then, the President's recognition determination is just one part of a political process that may require Congress to make laws. The President's exclusive recognition power encompasses the authority to acknowledge, in a formal sense, the legitimacy of other states and governments, including their territorial bounds. Albeit limited, the exclusive recognition power is essential to the conduct of Presidential duties. The formal act of recognition is an executive power that Congress may not qualify. If the President is to be effective in negotiations over a formal recognition determination, it must be evident to his counterparts abroad that he speaks for the Nation on that precise question.
*2088 A clear rule that the formal power to recognize a foreign government subsists in the President therefore serves a necessary purpose in diplomatic relations. All this, of course, underscores that Congress has an important role in other aspects of foreign policy, and the President may be bound by any number of laws Congress enacts. In this way ambition counters ambition, ensuring that the democratic will of the people is observed and respected in foreign affairs as in the domestic realm. See The Federalist No. 51, p. 322 (J. Madison).
B
No single precedent resolves the question whether the President has exclusive recognition authority and, if so, how far that power extends. In part that is because, until today, the political branches have resolved their disputes over questions of recognition. The relevant cases, though providing important instruction, address the division of recognition power between the Federal Government and the States, see, e.g.,Pink,315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, or between the courts and the political branches, see, e.g., Banco Nacional de Cuba,376 U.S., at 410, 84 S.Ct. 923-not between the President and Congress. As the parties acknowledge, some isolated statements in those cases lend support to the position that Congress has a role in the recognition process. In the end, however, a fair reading of the cases shows that the President's role in the recognition process is both central and exclusive.
During the administration of President Van Buren, in a case involving a dispute over the status of the Falkland Islands, the Court noted that "when the executive branch of the government" assumes "a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department." Williams,13 Pet., at 420. Once the President has made his determination, it "is enough to know, that in the exercise of his constitutional functions, he has decided the question. Having done this under the responsibilities which belong to him, it is obligatory on the people and government of the Union." Ibid.
Later, during the 1930's and 1940's, the Court addressed issues surrounding President Roosevelt's decision to recognize the Soviet Government of Russia. In United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), and Pink,315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, New York state courts declined to give full effect to the terms of executive agreements the President had concluded in negotiations over recognition of the Soviet regime. In particular the state courts, based on New York public policy, did not treat assets that had been seized by the Soviet Government as property of Russia and declined to turn those assets over to the United States. The Court stated that it "may not be doubted" that "recognition, establishment of diplomatic relations, ... and agreements with respect thereto" are "within the competence of the President." Belmont,301 U.S., at 330, 57 S.Ct. 758. In these matters, "the Executive ha[s] authority to speak as the sole organ of th [e] government." Ibid.The Court added that the President's authority "is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition." Pink, supra,at 229, 62 S.Ct. 552; see also Guaranty Trust Co.,304 U.S., at 137-138, 58 S.Ct. 785(The "political department['s] ... action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts"). Thus, *2089 New York state courts were required to respect the executive agreements.
It is true, of course, that Belmontand Pinkare not direct holdings that the recognition power is exclusive. Those cases considered the validity of executive agreements, not the initial act of recognition. The President's determination in those cases did not contradict an Act of Congress. And the primary issue was whether the executive agreements could supersede state law. Still, the language in Pinkand Belmont,which confirms the President's competence to determine questions of recognition, is strong support for the conclusion that it is for the President alone to determine which foreign governments are legitimate.
Banco Nacional de Cubacontains even stronger statements regarding the President's authority over recognition. There, the status of Cuba's Government and its acts as a sovereign were at issue. As the Court explained, "Political recognition is exclusively a function of the Executive." 376 U.S., at 410, 84 S.Ct. 923. Because the Executive had recognized the Cuban Government, the Court held that it should be treated as sovereign and could benefit from the "act of state" doctrine. See also Baker v. Carr,369 U.S. 186, 213, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)("[I]t is the executive that determines a person's status as representative of a foreign government"); National City Bank of N.Y.,348 U.S., at 358, 75 S.Ct. 423("The status of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court"). As these cases illustrate, the Court has long considered recognition to be the exclusive prerogative of the Executive.
The Secretary now urges the Court to define the executive power over foreign relations in even broader terms. He contends that under the Court's precedent the President has "exclusive authority to conduct diplomatic relations," along with "the bulk of foreign-affairs powers." Brief for Respondent 18, 16. In support of his submission that the President has broad, undefined powers over foreign affairs, the Secretary quotes United States v. Curtiss-Wright Export Corp.,which described the President as "the sole organ of the federal government in the field of international relations." 299 U.S., at 320, 57 S.Ct. 216. This Court declines to acknowledge that unbounded power. A formulation broader than the rule that the President alone determines what nations to formally recognize as legitimate-and that he consequently controls his statements on matters of recognition-presents different issues and is unnecessary to the resolution of this case.
The Curtiss-Wrightcase does not extend so far as the Secretary suggests. In Curtiss-Wright,the Court considered whether a congressional delegation of power to the President was constitutional. Congress had passed a joint resolution giving the President the discretion to prohibit arms sales to certain militant powers in South America. The resolution provided criminal penalties for violation of those orders. Id.,at 311-312, 57 S.Ct. 216. The Court held that the delegation was constitutional, reasoning that Congress may grant the President substantial authority and discretion in the field of foreign affairs. Id.,at 315-329, 57 S.Ct. 216. Describing why such broad delegation may be appropriate, the opinion stated:
"In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He makestreaties with the advice and consent of the Senate; but he alone negotiates. Into *2090 the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As Marshall said in his great argument of March 7, 1800, in the House of Representatives, 'The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.' [10 Annals of Cong.] 613." Id.,at 319, 57 S.Ct. 216.
This description of the President's exclusive power was not necessary to the holding of Curtiss-Wright-which, after all, dealt with congressionally authorized action, not a unilateral Presidential determination. Indeed, Curtiss-Wrightdid not hold that the President is free from Congress' lawmaking power in the field of international relations. The President does have a unique role in communicating with foreign governments, as then-Congressman John Marshall acknowledged. See 10 Annals of Cong. 613 (1800) (cited in Curtiss-Wright, supra,at 319, 57 S.Ct. 216). But whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law.
In a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected. For it is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. See, e.g., Medellín v. Texas,552 U.S. 491, 523-532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); Youngstown,343 U.S., at 589, 72 S.Ct. 863; Little v. Barreme,2 Cranch 170, 177-179, 2 L.Ed. 243 (1804); Glennon, Two Views of Presidential Foreign Affairs Power: Little v. Barremeor Curtiss-Wright? 13 Yale J. Int'l L. 5, 19-20 (1988); cf. Dames & Moore v. Regan,453 U.S. 654, 680-681, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). It is not for the President alone to determine the whole content of the Nation's foreign policy.
That said, judicial precedent and historical practice teach that it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate, both for the Nation as a whole and for the purpose of making his own position clear within the context of recognition in discussions and negotiations with foreign nations. Recognition is an act with immediate and powerful significance for international relations, so the President's position must be clear. Congress cannot require him to contradict his own statement regarding a determination of formal recognition.
Zivotofsky's contrary arguments are unconvincing. The decisions he relies upon are largely inapposite. This Court's cases do not hold that the recognition power is shared. Jones v. United States,137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691 (1890), and Boumediene v. Bush,553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), each addressed the status of territories controlled or acquired by the United States-not whether a province ought to be recognized as part of a foreign country. See also Vermilya-Brown Co. v. Connell,335 U.S. 377, 380, 69 S.Ct. 140, 93 L.Ed. 76 (1948)("[D]etermination of [American] sovereignty over an area is for the legislative and executive departments"). And no one disputes that Congress has a role in determining the status of United States territories. See U.S. Const., Art. IV, § 3, cl. 2(Congress may "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States"). Other cases describing a shared power address the recognition of Indian tribes-which is, similarly, a distinct issue from the recognition *2091 of foreign countries. See Cherokee Nation v. Georgia,5 Pet. 1, 8 L.Ed. 25 (1831).
To be sure, the Court has mentioned both of the political branches in discussing international recognition, but it has done so primarily in affirming that the Judiciary is not responsible for recognizing foreign nations. See Oetjen,246 U.S., at 302, 38 S.Ct. 309(" 'Who is the sovereign, de jureor de facto,of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges' " (quoting Jones, supra,at 212, 11 S.Ct. 80)); United States v. Palmer,3 Wheat. 610, 643, 4 L.Ed. 471 (1818)("[T]he courts of the union must view [a] newly constituted government as it is viewed by the legislative and executive departments of the government of the United States"). This is consistent with the fact that Congress, in the ordinary course, does support the President's recognition policy, for instance by confirming an ambassador to the recognized foreign government. Those cases do not cast doubt on the view that the Executive Branch determines whether the United States will recognize foreign states and governments and their territorial bounds.
C
Having examined the Constitution's text and this Court's precedent, it is appropriate to turn to accepted understandings and practice. In separation-of-powers cases this Court has often "put significant weight upon historical practice." NLRB v. Noel Canning,573 U.S. ----, ----, 134 S.Ct. 2550, 2559, 189 L.Ed.2d 538 (2014)(emphasis deleted). Here, history is not all on one side, but on balance it provides strong support for the conclusion that the recognition power is the President's alone. As Zivotofsky argues, certain historical incidents can be interpreted to support the position that recognition is a shared power. But the weight of historical evidence supports the opposite view, which is that the formal determination of recognition is a power to be exercised only by the President.
The briefs of the parties and amici,which have been of considerable assistance to the Court, give a more complete account of the relevant history, as do the works of scholars in this field. See, e.g., Brief for Respondent 26-39; Brief for Petitioner 34-57; Brief for American Jewish Committee as Amicus Curiae6-24; J. Goebel, The Recognition Policy of the United States 97-170 (1915) (Goebel); 1 Moore §§ 28-58, 74-164; Reinstein, Is the President's Recognition Power Exclusive? 86 Temp. L. Rev. 1, 3-50 (2013). But even a brief survey of the major historical examples, with an emphasis on those said to favor Zivotofsky, establishes no more than that some Presidents have chosen to cooperate with Congress, not that Congress itself has exercised the recognition power.
From the first Administration forward, the President has claimed unilateral authority to recognize foreign sovereigns. For the most part, Congress has acquiesced in the Executive's exercise of the recognition power. On occasion, the President has chosen, as may often be prudent, to consult and coordinate with Congress. As Judge Tatel noted in this case, however, "the most striking thing" about the history of recognition "is what is absent from it: a situation like this one," where Congress has enacted a statute contrary to the President's formal and considered statement concerning recognition. 725 F.3d, at 221(concurring opinion).
The first debate over the recognition power arose in 1793, after France had been torn by revolution. See Prakash & Ramsey, *2092 The Executive Power over Foreign Affairs, 111 Yale L.J. 231, 312 (2001). Once the Revolutionary Government was established, Secretary of State Jefferson and President Washington, without consulting Congress, authorized the American Ambassador to resume relations with the new regime. See Letter to Gouverneur Morris (Mar. 12, 1793), in 25 Papers of Thomas Jefferson 367, 367-368 (J. Catanzariti ed. 1992); Goebel 99-104. Soon thereafter, the new French Government proposed to send an ambassador, Citizen Genet, to the United States. See id.,at 105. Members of the President's Cabinet agreed that receiving Genet would be a binding and public act of recognition. See Opinion on the Treaties with France (Apr. 28, 1793), in 25 Papers of Thomas Jefferson, at 608, 612 ("The reception of the Minister at all ... is an ackno[w]le [d]gement of the legitimacy of their government"); see also Letter from A. Hamilton to G. Washington (Cabinet Paper) (Apr. 1793), in 4 Works of Alexander Hamilton 369, 369-396 (H. Lodge ed. 1904). They decided, however, both that Genet should be received and that consultation with Congress was not necessary. See T. Jefferson, Anas (Apr. 18, 1793), in 1 Writings of Thomas Jefferson 226, 227 (P. Ford ed. 1892); Cabinet Opinion on Washington's Questions on Neutrality and the Alliance with France (Apr. 19, 1793), in 25 Papers of Thomas Jefferson, at 570. Congress expressed no disagreement with this position, and Genet's reception marked the Nation's first act of recognition-one made by the President alone. See Prakash, supra,at 312-313.
The recognition power again became relevant when yet another revolution took place-this time, in South America, as several colonies rose against Spain. In 1818, Speaker of the House Henry Clay announced he "intended moving the recognition of Buenos Ayres and probably of Chile." Goebel 121. Clay thus sought to appropriate money " '[f]or one year's salary' " for " 'a Minister' " to present-day Argentina. 32 Annals of Cong. 1500 (1818). President Monroe, however, did not share that view. Although Clay gave "one of the most remarkable speeches of his career," his proposed bill was defeated. Goebel 123; 32 Annals of Cong. 1655. That action has been attributed, in part, to the fact that Congress agreed the recognition power rested solely with the President. Goebel 124; see, e.g., 32 Annals of Cong. 1570 (statement of Rep. Alexander Smyth) ("[T]he acknowledgment of the independence of a new Power is an exercise of Executive authority; consequently, for Congress to direct the Executive how he shall exercise this power, is an act of usurpation"). Four years later, after the President had decided to recognize the South American republics, Congress did pass a resolution, on his request, appropriating funds for "such missions to the independent nations on the American continent, as the President of the United States may deem proper." Act of May 4, 1822, ch. 52, 3 Stat. 678.
A decade later, President Jackson faced a recognition crisis over Texas. In 1835, Texas rebelled against Mexico and formed its own government. See Goebel 144-147. But the President feared that recognizing the new government could ignite a war. See A. Jackson, To the Senate and House of Representatives of the United States (Dec. 21, 1836), in 3 Messages and Papers of the Presidents 265, 266-267 (J. Richardson ed. 1899). After Congress urged him to recognize Texas, see Cong. Globe, 24th Cong., 1st Sess., 453 (1836); H.R.Rep. No. 854, 24th Cong., 1st Sess. (1836), the President delivered a message to the Legislature. He concluded there had not been a "deliberate inquiry" into whether the President or Congress possessed the recognition power. See A. Jackson, in 3 Messages *2093 and Papers of the Presidents, at 267. He stated, however, "on the ground of expediency, I am disposed to concur" with Congress' preference regarding Texas. Ibid. In response Congress appropriated funds for a "diplomatic agent to be sent to the Republic of Texas, whenever the President of the United States ... shall deem it expedient to appoint such minister." Act of Mar. 3, 1837, 5 Stat. 170. Thus, although he cooperated with Congress, the President was left to execute the formal act of recognition.
President Lincoln, too, sought to coordinate with Congress when he requested support for his recognition of Liberia and Haiti. In his first annual message to Congress he said he could see no reason "why we should persevere longer in withholding our recognition of the independence and sovereignty of Hayti and Liberia." Lincoln's First Annual Message to Congress (Dec. 3, 1861), in 6 Messages and Papers of the Presidents 44, 47. Nonetheless, he was "[u]nwilling" to "inaugurate a novel policy in regard to them without the approbation of Congress." Ibid.In response Congress concurred in the President's recognition determination and enacted a law appropriating funds to appoint diplomatic representatives to the two countries-leaving, as usual, the actual dispatch of ambassadors and formal statement of recognition to the President. Act of June 5, 1862, 12 Stat. 421.
Three decades later, the branches again were able to reach an accord, this time with regard to Cuba. In 1898, an insurgency against the Spanish colonial government was raging in Cuba. President McKinley determined to ask Congress for authorization to send armed forces to Cuba to help quell the violence. See 31 Cong. Rec. 3699-3702 (1898). Although McKinley thought Spain was to blame for the strife, he opposed recognizing either Cuba or its insurgent government. Id.,at 3701. At first, the House proposed a resolution consistent with McKinley's wishes. Id.,at 3810. The Senate countered with a resolution that authorized the use of force but that did recognize both Cuban independence and the insurgent government. Id.,at 3993. When the Senate's version reached the House, the House again rejected the language recognizing Cuban independence. Id.,at 4017. The resolution went to Conference, which, after debate, reached a compromise. See Reinstein, 86 Temp. L. Rev., at 40-41. The final resolution stated "the people of the Island of Cuba are, and of right ought to be, free and independent," but made no mention of recognizing a new Cuban Government. Act of Apr. 20, 1898, 30 Stat. 738. Accepting the compromise, the President signed the joint resolution. See Reinstein, 86 Temp. L. Rev., at 41.
For the next 80 years, "[P]residents consistently recognized new states and governments without any serious opposition from, or activity in, Congress." Ibid.; see 2 Whiteman §§ 6-60, at 133-242 (detailing over 50 recognition decisions made by the Executive). The next debate over recognition did not occur until the late 1970's. It concerned China.
President Carter recognized the People's Republic of China (PRC) as the government of China, and derecognized the Republic of China, located on Taiwan. See S. Kan, Cong. Research Serv., China/Taiwan: Evolution of the "One China" Policy-Key Statements from Washington, Beijing, and Taipei 1, 10 (Oct. 10, 2014). As to the status of Taiwan, the President "acknowledge[d] the Chinese position" that "Taiwan is part of China," id.,at 39(text of U.S.-PRC Joint Communique on the Establishment of Diplomatic Relations (Jan. 1, 1979)), but he did not accept that claim. The President proposed a new law *2094 defining how the United States would conduct business with Taiwan. See Hearings on Taiwan Legislation before the House Committee on Foreign Affairs, 96th Cong., 1st Sess., 2-6 (1979) (statement of Warren Christopher, Deputy Secretary of State). After extensive revisions, Congress passed, and the President signed, the Taiwan Relations Act, 93 Stat. 14 (1979) (codified as amended at 22 U.S.C. §§ 3301-3316). The Act (in a simplified summary) treated Taiwan as if it were a legally distinct entity from China-an entity with which the United States intended to maintain strong ties. See, e.g.,§§ 3301, 3303(a), (b)(1), (b)(7).
Throughout the legislative process, however, no one raised a serious question regarding the President's exclusive authority to recognize the PRC-or to decline to grant formal recognition to Taiwan. See, e.g., 125 Cong. Rec. 6709 (1979) (statement of Sen. Jacob Javits) ("Neither bill [proposed by either Chamber] sought to reestablish official relations between the United States and the Republic of China on Taiwan; Congress ... does not have the authority to do that even if it wanted to do so"). Rather, Congress accepted the President's recognition determination as a completed, lawful act; and it proceeded to outline the trade and policy provisions that, in its judgment, were appropriate in light of that decision.
This history confirms the Court's conclusion in the instant case that the power to recognize or decline to recognize a foreign state and its territorial bounds resides in the President alone. For the most part, Congress has respected the Executive's policies and positions as to formal recognition. At times, Congress itself has defended the President's constitutional prerogative. Over the last 100 years, there has been scarcely any debate over the President's power to recognize foreign states. In this respect the Legislature, in the narrow context of recognition, on balance has acknowledged the importance of speaking "with one voice." Crosby,530 U.S., at 381, 120 S.Ct. 2288. The weight of historical evidence indicates Congress has accepted that the power to recognize foreign states and governments and their territorial bounds is exclusive to the Presidency.
III
As the power to recognize foreign states resides in the President alone, the question becomes whether § 214(d) infringes on the Executive's consistent decision to withhold recognition with respect to Jerusalem. See Nixon v. Administrator of General Services,433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977)(action unlawful when it "prevents the Executive Branch from accomplishing its constitutionally assigned functions").
Section 214(d) requires that, in a passport or consular report of birth abroad, "the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel" for a "United States citizen born in the city of Jerusalem." 116 Stat. 1366. That is, § 214(d) requires the President, through the Secretary, to identify citizens born in Jerusalem who so request as being born in Israel. But according to the President, those citizens were not born in Israel. As a matter of United States policy, neither Israel nor any other country is acknowledged as having sovereignty over Jerusalem. In this way, § 214(d) "directly contradicts" the "carefully calibrated and longstanding Executive branch policy of neutrality toward Jerusalem." 725 F.3d, at 217, 216.
If the power over recognition is to mean anything, it must mean that the President not only makes the initial, formal recognition determination but also *2095 that he may maintain that determination in his and his agent's statements. This conclusion is a matter of both common sense and necessity. If Congress could command the President to state a recognition position inconsistent with his own, Congress could override the President's recognition determination. Under international law, recognition may be effected by "written or oral declaration of the recognizing state." 1 Moore § 27, at 73. In addition an act of recognition must "leave no doubt as to the intention to grant it." 1 Oppenheim's International Law § 50, at 169. Thus, if Congress could alter the President's statements on matters of recognition or force him to contradict them, Congress in effect would exercise the recognition power.
As Justice Jackson wrote in Youngstown,when a Presidential power is "exclusive," it "disabl[es] the Congress from acting upon the subject." 343 U.S., at 637-638, 72 S.Ct. 863(concurring opinion). Here, the subject is quite narrow: The Executive's exclusive power extends no further than his formal recognition determination. But as to that determination, Congress may not enact a law that directly contradicts it. This is not to say Congress may not express its disagreement with the President in myriad ways. For example, it may enact an embargo, decline to confirm an ambassador, or even declare war. But none of these acts would alter the President's recognition decision.
If Congress may not pass a law, speaking in its own voice, that effects formal recognition, then it follows that it may not force the President himself to contradict his earlier statement. That congressional command would not only prevent the Nation from speaking with one voice but also prevent the Executive itself from doing so in conducting foreign relations.
Although the statement required by § 214(d) would not itself constitute a formal act of recognition, it is a mandate that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State. See Urtetiqui v. D'Arcy,9 Pet. 692, 699, 9 L.Ed. 276 (1835)(a passport "from its nature and object, is addressed to foreign powers" and "is to be considered ... in the character of a political document"). As a result, it is unconstitutional. This is all the more clear in light of the longstanding treatment of a passport's place-of-birth section as an official executive statement implicating recognition. See 725 F.3d, at 224(Tatel, J., concurring). The Secretary's position on this point has been consistent: He will not place information in the place-of-birth section of a passport that contradicts the President's recognition policy. See 7 FAM § 1383. If a citizen objects to the country listed as sovereign over his place of birth, then the Secretary will accommodate him by listing the city or town of birth rather than the country. See id.,§ 1383.6. But the Secretary will not list a sovereign that contradicts the President's recognition policy in a passport. Thus, the Secretary will not list "Israel" in a passport as the country containing Jerusalem.
The flaw in § 214(d) is further underscored by the undoubted fact that the purpose of the statute was to infringe on the recognition power-a power the Court now holds is the sole prerogative of the President. The statute is titled "United States Policy with Respect to Jerusalem as the Capital of Israel." § 214, 116 Stat. 1365. The House Conference Report proclaimed that § 214 "contains four provisions related to the recognition of Jerusalem as Israel's capital." H.R. Conf. Rep. No. 107-671, p. 123(2002), 2002 U.S.C.C.A.N. 869. And, indeed, observers interpreted § 214 as altering United States policy regarding *2096 Jerusalem-which led to protests across the region. See supra, at 2082 - 2083. From the face of § 214, from the legislative history, and from its reception, it is clear that Congress wanted to express its displeasure with the President's policy by, among other things, commanding the Executive to contradict his own, earlier stated position on Jerusalem. This Congress may not do.
It is true, as Zivotofsky notes, that Congress has substantial authority over passports. See Haig v. Agee,453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); Zemel v. Rusk,381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Kent v. Dulles,357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). The Court does not question the power of Congress to enact passport legislation of wide scope. In Kent v. Dulles,for example, the Court held that if a person's " 'liberty' " to travel "is to be regulated" through a passport, "it must be pursuant to the law-making functions of the Congress." See ibr.US_Case_Law.Schema.Case_Body:v1">id., at 129, 78 S.Ct. 1113. Later cases, such as Zemel v. Ruskand Haig v. Agee,also proceeded on the assumption that Congress must authorize the grounds on which passports may be approved or denied. See Zemel, supra,at 7-13, 85 S.Ct. 1271; Haig, supra,at 289-306, 101 S.Ct. 2766. This is consistent with the extensive lawmaking power the Constitution vests in Congress over the Nation's foreign affairs.
The problem with § 214(d), however, lies in how Congress exercised its authority over passports. It was an improper act for Congress to "aggrandiz[e] its power at the expense of another branch" by requiring the President to contradict an earlier recognition determination in an official document issued by the Executive Branch. Freytag v. Commissioner,501 U.S. 868, 878, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). To allow Congress to control the President's communication in the context of a formal recognition determination is to allow Congress to exercise that exclusive power itself. As a result, the statute is unconstitutional.
* * *
In holding § 214(d) invalid the Court does not question the substantial powers of Congress over foreign affairs in general or passports in particular. This case is confined solely to the exclusive power of the President to control recognition determinations, including formal statements by the Executive Branch acknowledging the legitimacy of a state or government and its territorial bounds. Congress cannot command the President to contradict an earlier recognition determination in the issuance of passports.
The judgment of the Court of Appeals for the District of Columbia Circuit is
Affirmed.