# Supreme Court of Texas

═══════

No. 23-0697

═══════

State of Texas; Office of the Attorney General of the
State of Texas; Texas Medical Board; Texas Health and Human
Services Commission; and Ken Paxton, in his official capacity as
Attorney General of the State of Texas,

*Appellants*,

v.

Lazaro Loe, individually and as next friend of Luna Loe, a minor;
Mary Moe and Matthew Moe, individually and as next friends of
Maeve Moe, a minor; Nora Noe, individually and as next friend of
Nathan Noe, a minor; Sarah Soe and Steven Soe, individually
and as next friends of Samantha Soe, a minor; Gina Goe,
individually and as next friend of Grayson Goe, a minor;
PFLAG, Inc.; Richard Ogden Roberts III, M.D.; David L. Paul,
M.D.; Patrick W. O'Malley, M.D.; and American Association of
Physicians for Human Rights, Inc. d/b/a GLMA: Health
Professionals Advancing LGBTQ Equality,

*Appellees*

═══════════════════════════════

On Direct Appeal from the
201st District Court, Travis County, Texas

═══════════════════════════════

JUSTICE BUSBY, concurring.

The principal question that the parties in this case have brought to the Court is whether the fundamental natural right of parents to make decisions concerning the care, custody, and control of their children is infringed by the Texas Legislature's choice to limit the availability of certain medical therapies for children diagnosed with gender dysphoria. To answer this question, we examine whether parental control over the sort of medical decision at issue is, "objectively, deeply rooted in [our] history and tradition" and therefore a protected liberty under the Texas Constitution. *Ante* at 18 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).

As the Court and Justice Blacklock explain, gender dysphoria is a relatively new diagnosis and there is substantial debate in the medical community regarding the benefits and harms of the therapies limited by this law, which do not promote normal biological functioning. *Ante* at 2-3 & n.2, 24 & n.13; *ante* at 14-16 (Blacklock, J., concurring). A parental right to demand such therapies for a recently identified diagnosis is not deeply rooted in our history and tradition. Under our precedent, then, the statute faces only rational-basis scrutiny, which it satisfies. *Ante* at 27.

Like Justices Blacklock and Young, I do not understand the Court's opinion to (1) change the nature or focus of the *Glucksberg* inquiry into whether parents are asserting a fundamental right deeply rooted in our history and tradition, (2) modify the scope of parents' traditional authority to make medical decisions for their children, or (3) alter our precedent that the government may not intrude into this zone of traditional parental authority absent extraordinary justification or,

2

in some circumstances, not at all. *Ante* at 13-14, 20-22 (Blacklock, J., concurring); *post* at 8-12 (Young, J., concurring). Instead, the Court simply applies the established *Glucksberg* inquiry to the facts of this case, holding "only that novel treatments for a novel condition are generally within the Legislature's power to regulate without facing heightened scrutiny." *Ante* at 23. Because I agree with that holding, I join the Court's opinion.

I write separately to make clear that the scope of traditional parental rights remains broad and well supported by our precedent. And when conducting the *Glucksberg* inquiry, courts focus on whether the parents' claimed interest falls *within* the scope of this liberty from government control over traditional child-rearing decisions, not whether the interest falls *outside* the scope of the government's power to legislate. An individual right that extends only to conduct the government chooses to permit is no right at all. Rather, under our federal constitutional structure, fundamental individual rights retained by the people are "exceptions to the legislative authority."[1] Our Texas Constitution has unequivocally adopted this understanding of individual rights, providing expressly that such rights are "excepted out of the general powers of government." TEX. CONST. art. I, § 29.

To begin, we must understand the asserted right and its source. "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of . . . parents . . . is now established beyond debate as

---

[1] THE FEDERALIST NO. 78, at 524 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). "This natural parental right has been characterized as 'essential,' 'a basic civil right of man,' and 'far more precious than property rights.'" *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (paraphrasing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). Less than a decade after Texas joined the United States, we expressed "no doubt [that] a [parent] has very ample authority in the control, management, rearing, and education of his children." *Byrne v. Love*, 14 Tex. 81, 91 (1855).

Not only do these natural parental rights find protection in various provisions of the United States and Texas Constitutions, they also shape what measures are within the powers that the people have delegated to their representatives in government. As Justice Lehrmann correctly observes,[2] our Court has been steadfast in acknowledging "[t]he natural right which exists between parents and their children [as] one of constitutional dimensions." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). For example, we have characterized this right as a "fundamental liberty interest" under the Due Process and Due Course Clauses, *In re N.G.*, 577 S.W.3d 230, 234-35 (Tex. 2019), which "protects the . . . right of parents to make decisions concerning the care, custody, and control of their children." *In re C.J.C.*, 603 S.W.3d 804, 811 (Tex. 2020) (quoting *Troxel v. Granville*, 530 U.S. 57, 67 (2000)). Other judges have explained that traditional parental rights may also—or

---

[2] *Post* at 17-19 (Lehrmann, J., dissenting).

4

alternatively—find protection as "unalienable Rights"[3] that are "retained by the people" under the Ninth Amendment,[4] or as privileges or immunities of citizenship.[5] Under whatever theory, this State—and this Court—have long "recognize[d] . . . that the interest of the child and of society is best promoted by leaving [traditional parenting decisions] untrammeled by the surveillance of government." *Legate v. Legate*, 28 S.W. 281, 282 (Tex. 1894).

I agree with the Court that this right is not absolute. Few rights are. Even the unalienable right to life,[6] which also finds robust protection in the Due Process and Due Course Clauses, may be taken from those who commit capital murder.[7] But the fundamental rights of parents offer very substantial protection against government interference with decisions that fall within their scope. For example, we have applied strict scrutiny to laws concerning the termination of parental rights, *Wiley*, 543 S.W.2d at 352, and explained that temporary court orders affecting children "cannot act to infringe" on "[p]arental

---

[3] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

[4] U.S. CONST. amend. IX; *see Martin v. Hunter's Lessee*, 14 U.S. 304, 325 (1816) (acknowledging the people's "right . . . to reserve to themselves those sovereign authorities which they might not choose to delegate to [government]").

[5] *E.g.*, *In re H.S.*, 550 S.W.3d 151, 177 (Tex. 2018) (Blacklock, J., dissenting) (citing *Troxel*, 530 U.S. at 80 (Thomas, J., concurring)).

[6] THE DECLARATION OF INDEPENDENCE para. 2.

[7] *Compare* U.S. CONST. amend. V, *and* TEX. CONST. art. I, § 19, *with* *Jurek v. Texas*, 428 U.S. 262, 276-77 (1976) (rejecting Eighth Amendment challenge to Texas death penalty statute), TEX. PENAL CODE § 19.03, *and* TEX. CODE CRIM. PROC. art. 37.071.

control and autonomy" when the "parent adequately cares for his children." *In re Scheller*, 325 S.W.3d 640, 644 (Tex. 2010). Outside this scope, however, the government retains the same power of legislation that it has always had. *Ante* at 26-30 (concluding that "plaintiffs incorrectly characterize the scope of the constitutionally protected interest" and applying rational-basis scrutiny in resolving due-course challenge to statute).

Thus, the pertinent question in deciding what protection parental decisions receive in a given case is not whether the right is absolute, it is how to define the right's limits. As discussed above, the *Glucksberg* inquiry determines whether the type of parental decision in question— when carefully described—is an exercise of deeply rooted rights. If so, it receives "heightened protection against government interference." *Glucksberg*, 521 U.S. at 720.

For this reason, it would be wrong to conclude from the opinions in today's case that parents' fundamental rights generally take their limits from the nature of the state power being exercised rather than from "this Nation's history and tradition." *Id.* at 721. An individual constitutional right checks a broad grant of state power to legislate, not the other way around.[8]

---

[8] I recognize that there might be exceptional cases in which the grant of a narrow or specific power to legislate would be inconsistent with construing a general right to provide protection for individual conduct inconsistent with such legislation. I do not disagree with the Court that "express constitutional authorization for . . . the challenged law" would be relevant in that case. *Ante* at 26 n.14. But this is not such a case.

"[R]estrictions on government power . . . such as contained in the Bill of Rights . . . come into play . . . only where the Government possesses authority to act in the first place." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535 (2012). Determining the government's power to legislate is a necessary first step, therefore, as the scope of an individual right need not be considered if the law itself is unauthorized. Yet if there is government power to act, individual constitutional rights provide "restrictions on [that] power," *id.*, protecting conduct that falls within their scope.[9]

As the Supreme Court explained in *Wisconsin v. Yoder*, "[t]here is no doubt as to the *power* of a State . . . to impose reasonable regulations for the control and duration of basic education. . . . Providing public schools ranks at the very apex of the function of a State. Yet even this paramount responsibility . . . yield[s] to the *right of parents* to provide an equivalent education . . . ." 406 U.S. at 213 (emphases added). Other examples abound. To name just two, state power to pass laws prohibiting discrimination in public accommodations must yield to First

---

[9] *See also Zivotofsky v. Kerry*, 576 U.S. 1, 48 (2015) (Thomas, J., concurring in part) (describing "the protections for retained individual rights under the Constitution" as a "key limitation[] on [Congress's] jurisdiction"); *Pointer v. Texas*, 380 U.S. 400, 414 (1965) (Goldberg, J., concurring) (observing that the Constitution "limit[s] the power of both federal and state governments in favor of safeguarding the fundamental rights and liberties of the individual," "deny[ing] to [government] the power to impair a fundamental constitutional right"); *Block v. Hirsh*, 256 U.S. 135, 160 (1921) (McKenna, J., dissenting) ("[T]he Constitution is . . . a restraint upon government, purposely provided and declared upon consideration of all the consequences of what it prohibits and permits, making the restraints upon government the rights of the governed. And this careful adjustment of power and rights makes the Constitution what it was intended to be and is, a real charter of liberty . . . .").

Amendment rights, and Congress's plenary authority over immigration must be exercised consistent with the Equal Protection Clause.[10]

James Madison made this very point when introducing the initial draft of the Bill of Rights on the floor of the House of Representatives, observing that "a bill of rights" would provide "particular exceptions to the grant of power."[11] Similarly, Alexander Hamilton wrote in the Federalist Papers that our "limited constitution" contains "certain specified exceptions to the legislative authority."[12] And the Texas Constitution addresses the relationship between government power and retained individual rights directly, making explicit what is implicit in our federal constitutional scheme:

> To guard against transgressions of the high powers herein delegated, we declare that every thing in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto . . . shall be void.

---

[10] *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023) ("[N]o public accommodations law is immune from the demands of the Constitution."); *Sessions v. Morales-Santana*, 582 U.S. 47, 52 (2017); *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51-52 (1989) (holding Congress "lacks the power to strip parties . . . contesting matters of private right of their constitutional right to a jury trial").

[11] 1 ANNALS OF CONG. 456 (1789) (Joseph Gales ed., 1834). Madison also emphasized that the bill should not be understood to "disparage those rights which were not placed in that enumeration" or imply that such rights "were intended to be assigned into the hands of the General Government, and were consequently insecure." *Id.*

[12] THE FEDERALIST NO. 78, at 524.

TEX. CONST. art. I, § 29. Because we have held that fundamental parental rights are protected under the Due Course Clause of our Bill of Rights, this declaration applies here.

If government power instead trumped individual rights whenever an authorized law has a rational basis, troubling questions would follow. Could the Legislature use its express constitutional authority over the practice of medicine to require the resuscitation of a critically ill child despite a fit parent's do-not-resuscitate order, or to forbid the resuscitation of children with severe mental disabilities so that limited resources could be used to help other children? Could it make heroic medical measures legally unavailable to elderly Texans to save money on social service programs, or prevent parents from obtaining prenatal care for pregnant girls to discourage teen pregnancy? Or could the Legislature invoke its fundamental interest in protecting child welfare to forbid any corporal discipline by parents?

Fortunately, our constitutional structure does not leave the answers to such challenging and consequential questions to a rationality test that can depend on the eye of the beholder. Instead, government power is only the beginning of the analysis. If the asserted fundamental liberty interest is deeply rooted in our Nation's history and tradition, it receives heighted constitutional protection against otherwise-authorized government interference. *See Glucksberg*, 521 U.S. at 720-21. Because I agree with the Court that the interest asserted here does not receive such protection under the *Glucksberg* inquiry, I concur.

_____
J. Brett Busby
Justice

**OPINION FILED:** June 28, 2024