# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

RODOLFO ENRIQUE JIMÉNEZ, )
ASDRÚBAL CHAVEZ, IRIS )
MEDINA, MARCOS ROJAS, JOSÉ )
ALEJANDRO ROJAS, and )
FERNANDO DE QUINTAL, )
 )
       Plaintiffs/Counterclaim- )
       Defendants, )
 )
       v. )    C.A. No. 2019-0490-KSJM
 )
LUISA PALACIOS, EDGAR )
RINCÓN, FERNANDO VERA, ELIO )
TORTOLERO, ANDRÉS PADILLA, )
ÁNGEL OLMETA, JAVIER )
TROCONIS, LUIS URDANETA, and )
RICK ESSER, )
 )
       Defendants/Counterclaim- )
       Plaintiffs, )
 )
       and )
 )
PDV HOLDING, INC., CITGO )
HOLDING, INC., and CITGO )
PETROLEUM CORPORATION, )
 )
       Nominal Defendants. )

## OPINION

Date Submitted: July 23, 2019
Date Decided: August 2, 2019
Revised: August 12, 2019

Daniel B. Rath, Rebecca Butcher, Jennifer L. Cree, LANDIS RATH & COBB LLP, Wilmington, Delaware; Quinn Smith, Katherine J. Sanoja, GST LLP, Miami,

Florida; Gary J. Shaw, GST LLP, Washington, D.C.; *Counsel for Plaintiffs and Counterclaim-Defendants Rodolfo Enrique Jiménez, Asdrúbal Chavez, Iris Medina, Marcos Rojas, José Alejandro Rojas, and Fernando de Quintal.*

Kenneth J. Nachbar, Susan W. Waesco, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael J. Gottlieb, Samuel Hall, WILLKIE FARR & GALLAGHER LLP, Washington, D.C.; Tariq Mundiya, Martin L. Seidel, Jonathan D. Waisnor, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Counsel for Defendants and Counterclaim-Plaintiffs Luisa Palacios, Edgar Rincón, Fernando Vera, Elio Tortolero, Andrés Padilla, Ángel Olmeta, Javier Troconis, Luis Urdaneta, and Rick Esser.*

A. Thompson Bayliss, J. Peter Shindel, Jr., Daniel J. McBride, ABRAMS & BAYLISS LLP, Wilmington, Delaware; José Ignacio Hernández G., Special Attorney General of Venezuela, Washington, D.C.; *Counsel for Amicus Curiae the Bolivarian Republic of Venezuela.*


**McCORMICK, V.C.**

In January 2019, after a controversial presidential election, the National Assembly of Venezuela declared the presidency of Nicolás Maduro illegitimate and appointed opposition leader Juan Guaidó as Interim President. In response, the President of the United States officially recognized the Guaidó government as sovereign. After Guaidó assumed office, his government appointed a new board of directors to govern Petróleos de Venezuela, S.A. ("PDVSA"), Venezuela's state-owned oil company. Guaidó's newly appointed directors then reconstituted the boards of directors of the nominal defendants in this action—three Delaware entities directly or indirectly owned by PDVSA.

The plaintiffs served as directors of the nominal defendants before Guaidó took office. They commenced this litigation pursuant to Section 225 of the Delaware General Corporation Law seeking a declaration that they comprise the rightful boards of the nominal defendants. The defendants, who are the directors appointed by Guaidó's PDVSA board, counterclaimed for a competing declaration.

The parties have cross-moved for judgment on the pleadings. They agree that the President of Venezuela has the power to appoint the members of the board of PDVSA and, indirectly, determine the composition of the boards of the nominal defendants. They disagree on who holds the title of President of Venezuela, whether Guaidó's actions successfully reconstituted the PDVSA board, and whether the PDVSA board successfully reconstituted the boards of the nominal defendants.

1

The outcome turns on two threshold issues that implicate doctrinal expressions of the concept of separation of powers—the political question and act of state doctrines. The political question doctrine requires courts to accept as binding the U.S. President's determination to recognize a foreign government. The act of state doctrine requires courts to assume the validity of an official act of a recognized foreign government performed within its own territory. Applying these doctrines, this decision accepts as binding the U.S. President's recognition of the Guaidó government and assumes the validity of the Guaidó government's appointments to the PDVSA board.

The plaintiffs raise myriad arguments in an effort to complicate this straightforward analysis. They parse the U.S. President's official statement recognizing the Guaidó government, arguing that Guaidó's authority as "interim" President is limited. They pit the internal affairs doctrine against the more potent political question and act of state doctrines, arguing that the former should override the latter. They invoke exceptions to the act of state doctrine, arguing that the Guaidó government lacks jurisdictional indicia of statehood and exceeded its territorial limitations when appointing directors to the PDVSA board. Not one of these arguments persuades, and this decision resolves these issues in favor of the defendants.

2

But this decision does not reach the ultimate question of who comprises the boards of the nominal defendants. The consents appointing the directors were provided to the plaintiffs as attachments to briefing and are not appropriately considered on a motion for judgment on the pleadings. This decision thus treats the defendants' motion as one for summary judgment and grants the plaintiffs an opportunity to submit an affidavit identifying disputed facts foreclosing summary judgment in the defendants' favor.

## I. FACTUAL BACKGROUND

As both sides correctly observe, the Court need not delve into the disputed facts concerning Venezuela's recent political turmoil in order to resolve the discrete legal issues presented by the cross motions. Yet, ignoring those events would cheat future readers of significant context. Thus, for context only, this factual background includes a summary of those events, which are not considered for the purpose of the legal analysis.[1] Otherwise, the facts are drawn from the parties' respective

---

[1] One fact the parties cannot reasonably dispute is that the Venezuelan people have suffered in recent years. The understated and truncated nature of the description of political events is in no way intended to trivialize the hardships they have faced.

pleadings, documents integral to or incorporated by reference therein,[2] and judicially noticeable facts.[3]

## A. Recent Political Turmoil in Venezuela

Following the 2013 death of Venezuelan President Hugo Chávez, his political heir Maduro became President of Venezuela. During Maduro's first term, Venezuela's economy spiraled downward, resulting in hyperinflation and a shortage of food and medical supplies. Some blamed Chávez and Maduro's economic

---

[2] *See* C.A. No. 2019-0490-KSJM Docket ("Dkt.") 1, Verified Compl. ("Compl."); Dkt. 16, Defs.' Answer to Verified Compl. and Verified Countercl. ("Countercl."); Dkt. 17, Pls.' Answer to Defs.' Countercls. ("Ans. to Countercl.").

[3] In the category of judicially noticeable facts, this decision references press statements and releases issued by official representatives of the U.S. federal government and recognized foreign governments. That the referenced statements and releases set forth certain positions of the U.S. federal government and other governments is not subject to reasonable dispute, and the Court may therefore take judicial notice of the positions set forth in the statements and releases. *See* D.R.E. 201(b); *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *4 n.34 (Del. Ch. Aug. 31, 2016) ("I take judicial notice of the publicly available press release announcing the appointment of Saladrigas as a Progress director in 2001[.]"); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 588 n.4 (S.D.N.Y. 2015) (taking judicial notice of information provided in government agencies' press releases under Federal Rule of Evidence 201). This decision also takes judicial notice of Executive Orders of the U.S. President, which have the same force and effect as governing law. *See Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964) ("[W]hen the President issues proclamations and orders . . . pursuant to a mandate or a delegation of authority from Congress[,] . . . the proclamations[] [and] orders . . . have the force and effect of laws."). *See also Diesel & Equip. Specialists, Inc. v. Tull*, 1983 WL 473061, at *1 (Del. Super. Dec. 7, 1983) (taking judicial notice of the governor's executive orders establishing legal holidays), *aff'd*, 494 A.2d 168 (Del. 1984); *State v. Patnovic*, 129 A.2d 780, 782 n.6 (Del. Super. 1957) (taking judicial notice of declarations by the governor and law enforcement agencies).

policies, including strict price controls. Protests and civil insurrection ensued. Arrests followed.

By late 2015, the opposition coalition had won control of Venezuela's legislative body, the National Assembly. Before the newly elected legislators took office, the National Assembly packed the Supreme Tribunal of Justice ("Supreme Tribunal") with judges reportedly loyal to Maduro. In early 2016, citing election irregularities, the Supreme Tribunal issued a ruling blocking three opposition lawmakers from taking office. The opposition coalition nevertheless swore in the three legislators, claiming the Supreme Tribunal's ruling was designed to strip the opposition of its supermajority in the National Assembly. In response, the Supreme Tribunal declared null and void decisions taken by the National Assembly while the three legislators held their seats. In March 2017, the Supreme Tribunal took over legislative powers from the National Assembly. The United States and other members of the international community condemned this action, prompting the Supreme Tribunal to reverse course in April 2017.

On May 1, 2017, the Maduro regime took a new approach, calling for a National Constituent Assembly ("Constituent Assembly") under Article 347 of the *Constitución de la República Bolivariana de Venezuela* (the "Venezuelan Constitution"). Members of the international community denounced the move as an unconstitutional effort to concentrate political power, and the opposition coalition

boycotted the July elections for the Constituent Assembly. The United States vowed "to take strong and swift actions" against the members of the Maduro regime, whom the U.S. Department of State referred to as the "architects of authoritarianism."[4] Protests and violence ushered in election results, according to some accounts.

In its first month of existence, the Constituent Assembly reportedly expressed support for Maduro, gave itself the power to legislate, and voted to put opposition leaders on trial for treason. The National Assembly refused to subordinate itself to the Constituent Assembly, resulting in two legislative bodies purporting to govern Venezuela.

Maduro disqualified the opposition parties from participating in the 2018 Presidential election, which he then claimed to win.

Amid a collapsing economy and growing humanitarian crisis, Maduro was sworn in for a second term as President of Venezuela on January 10, 2019. The National Assembly declared Maduro's presidency illegitimate on January 15, 2019. Invoking Article 233 of the Venezuelan Constitution, the National Assembly's president, Juan Guaidó, was named the Interim President of Venezuela on January 23, 2019.

---

[4] Press Statement, U.S. Dep't of State, Defending Democracy in Venezuela (July 30, 2017), *available at* https://www.state.gov/defending-democracy-in-venezuela-2/.

6

## B. PDVSA and the CITGO Entities

Although Venezuela's economy struggles, Venezuela's government lays claim to the largest proven oil reserves in the world. PDVSA is a Venezuelan company formed in 1975 by the President of Venezuela. Venezuela owns PDVSA, which indirectly owns CITGO Petroleum Corporation ("CITGO Petroleum"), a Delaware corporation headquartered in Houston and one of the largest operating petroleum refiners in the United States.

PDVSA owns CITGO Petroleum through two other Delaware corporations, PDV Holding, Inc. and CITGO Holding, Inc. (with CITGO Petroleum and PDV Holding, the "CITGO Entities"). Venezuela is the sole stockholder of PDVSA, PDVSA is the sole stockholder of PDV Holding,[5] PDV Holding is the sole stockholder of CITGO Holding, and CITGO Holding is the sole stockholder of CITGO Petroleum.

---

[5] On July 29, 2019, the United States Court of Appeals for the Third Circuit issued an opinion affirming a ruling that allowed Crystallex International Corporation to seize shares of PDV Holding to satisfy an arbitral award. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, -- F.3d --, 2019 WL 3403888, at *1, *17 (3d Cir. July 29, 2019). This ruling might affect ownership of these entities, but it does not alter the validity of the acts at issue in this case.

7

Historically, the President of Venezuela had the power to appoint the members of the board of directors of PDVSA by decree.[6] Maduro last exercised that authority in October 2018.[7]

## C.    The United States Recognizes the Guaidó Government.

The same day that Guaidó became the Interim President of Venezuela, the United States and a number of other countries recognized the Guaidó government. In a public statement on January 23, 2019, the U.S. President declared:

> Today, I am officially recognizing the President of the Venezuelan National Assembly, Juan Guaido, as the Interim President of Venezuela. In its role as the only legitimate branch of government duly elected by the Venezuelan people, the National Assembly invoked the country's constitution to declare Nicolas Maduro illegitimate, and the office of the presidency therefore vacant. . . .

> We encourage other Western Hemisphere governments to recognize National Assembly President Guaido as the Interim President of Venezuela, and we will work constructively with them in support of his efforts to restore constitutional legitimacy. We continue to hold the

---

[6] Compl. Ex. E, Apostilla de Estatuto Petróleos de Venezuela, Title IV, Article Seventeen ("The Board of Directors will be composed of at least seven (7) but no more than fifteen (15) members, appointed by Decree of the President of the Republic.").

[7] In October 2018, Maduro decreed that the following individuals would comprise the board of PDVSA: Manuel Salvador Quevedo Fernández; Miguel José Quintana Castro; Rodolfo Enrique Jiménez Jiménez; José Alejandro Rojas Reyes; Nemrod Antonio Contreras Mejías; Marcos Alejandro Rojas Marchena; Fernando Manuel de Quintal Rodríguez; Yurbis Josefina Gómez; Ricardo Andrés León Sabala; Wils Asención Rangel Linares; Simón Alejandro Zerpa Delgado; Ricardo José Menéndez Prieto; and Tareck Zaidan el Aissami Maddah. Compl. Ex. F, Decreto Nº 3.637 (Oct. 22, 2018).

8

illegitimate Maduro regime directly responsible for any threats it may pose to the safety of the Venezuelan people.[8]

On January 25, 2019, the U.S. Department of State accepted Interim President Guaidó's designation of Carlos Alfredo Vecchio as the Chargé d'Affaires of the government of Venezuela.[9]

_____

[8] *See* Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela (Jan. 23, 2019) (cited as the "January 23 Executive Statement"), Dkt. 25, Ex. A to the Transmittal Aff. of Kenneth J. Nachbar in Supp. of Defs. and Countercl.-Pls.' Opening Br. in Supp. of Their Mot. for Judgment on the Pleadings ("Nachbar 7/11/19 Aff."). *See also*, Press Statement, U.S. Dep't of State, Continuing U.S. Diplomatic Presence in Venezuela (Jan. 23, 2019) (cited as "Sec. Pompeo Statement") (U.S. Secretary of State Michael R. Pompeo stated: "The United States stands with interim President Juan Guaido . . . . The United States does not recognize the Maduro regime as the government of Venezuela."), *available at* https://www.state.gov/continuing-u-s-diplomatic-presence-in-venezuela/; Press Release, Foreign & Commonwealth Office and the Rt Hon Jeremy Hunt MP, UK recognises Juan Guaido as interim President of Venezuela (Feb. 4, 2019) (UK Foreign Secretary Jeremy Hunt stated: "The United Kingdom now recognises Juan Guaido as the constitutional interim President of Venezuela, until credible presidential elections can be held. . . . The UK takes this position alongside the Organisation of American States, the Lima Group, the United States and European partners."), *available at* https://www.gov.uk/government/news/uk-recognises-juan-guaido-as-interim-president-of-venezuela; Press Release, Fed. Ministry of Republic of Austria, Joint declaration on Venezuela (Feb. 4, 2019) ("Austria along with Spain, Portugal, Germany, the United Kingdom, Denmark, the Netherlands, France, Hungary, Finland, Belgium, Luxemburg, the Czech Republic, Latvia, Lithuania, Estonia, Poland, Sweden and Croatia takes note that Mr. Nicolás Maduro has chosen not to set in motion the electoral process. Subsequently, and in accordance with the provisions of the Venezuelan Constitution, they acknowledge and support Mr. Juan Guaidó, President of the democratically elected National Assembly, as President ad interim of Venezuela, in order for him to call for free, fair and democratic presidential elections."), *available at* https://www.bmeia.gv.at/en/the-ministry/press/announcements/2019/02/joint-declaration-on-venezuela/. The plaintiffs assert that Germany has withdrawn its recognition of the Guaidó government. Ans. to Countercl. ¶ 14.

[9] Press Statement, U.S. Dep't of State, Representative of the Government of Venezuela to the United States (Jan. 27, 2019) (recognizing that "Mr. Vecchio will have authority over diplomatic affairs in the United States on behalf of Venezuela" and "reaffirm[ing] the

According to the plaintiffs, Maduro continued to wield actual control over PDVSA's Venezuelan operations.[10]  According to the defendants, Maduro wielded this control through military force.[11]  According to the U.S. Executive Branch, the Maduro regime made "continued attempts to undermine the Interim President of Venezuela and undermine the National Assembly, the only legitimate branch of government duly elected by the Venezuelan people, and to prevent the Interim President and the National Assembly from exercising legitimate authority in Venezuela[.]"[12]  Citing these concerns, the U.S. President issued an Executive Order on January 25, 2019, that extended pre-existing sanctions to members of the Maduro regime.[13]  Then, on January 28, 2019, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") added PDVSA to its Specially Designated Nationals and Blocked Persons List.[14]  This designation prohibits U.S. persons

United States' strong support for interim President Guaido's leadership of Venezuela"), *available at* https://www.state.gov/representative-of-the-government-of-venezuela-to-the-united-states/.

[10] *See* Dkt. 21, Pls./Countercl. Defs.' Opening Br. in Supp. of Their Mot. for J. on the Pleadings ("Pls.' Opening Br.") at 30.

[11] *See* Countercl. ¶ 12.

[12] Executive Order 13857 (Jan. 25, 2019), Nachbar 7/11/19 Aff. Ex. B.  *See also* Countercl. ¶ 16; Ans. to Countercl. ¶ 16.

[13] Executive Order 13857 (Jan. 25, 2019), Nachbar 7/11/19 Aff. Ex. B.  *See also* Countercl. ¶ 16; Ans. to Countercl. ¶ 16.

[14] *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (Jan. 28, 2019) (cited as "January 2019 Treasury Press Release") ("Today's designation of PdVSA will help prevent further diverting of Venezuela's assets by Maduro and preserve these assets for the people of

"from engaging in transactions or dealings" with PDVSA in the absence of a license issued by OFAC.[15]  Concurrent with the designation, to mitigate market disruptions stemming from these sanctions, OFAC issued licenses creating exceptions to the sanctions on PDVSA and the CITGO Entities.[16]

On January 31, 2019, OFAC published a response to the frequently asked question, "[w]hen will sanctions be lifted on [PDVSA] or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest?"[17]  The response states:

> The path to sanctions relief for PdVSA and its subsidiaries is through the expeditious transfer of control of the company to Interim President Juan Guaidó or a subsequent, democratically elected government that is committed to taking concrete and meaningful actions to combat corruption, restore democracy, and respect human rights.  A bona fide transfer of control will ensure that the

---

Venezuela."), *available at* https://home.treasury.gov/news/press-releases/sm594.  *See also* Countercl. ¶ 16; Ans. to Countercl. ¶ 16.

[15] OFAC FAQs No. 547 (July 19, 2018), *available at* https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_other.aspx#venezuela.  *See also* Ans. to Countercl. ¶ 16 (referring to text of OFAC FAQ No. 547, among other things).  OFAC FAQs are U.S. Department of Treasury-prepared responses to frequently asked questions; they are not subject to reasonable dispute and capable of accurate and ready determination by resort to resources, such as Executive Orders, whose accuracy cannot reasonably be questioned. The Court therefore takes judicial notice of the OFAC FAQs discussed herein.  *See* D.R.E. 201(b).

[16] *See supra* n.14, January 2019 Treasury Press Release ("Concurrent with this [designation], OFAC is issuing general licenses that authorize certain transactions and activities related to PdVSA and its subsidiaries within specified timeframes.").

[17] OFAC FAQs No. 660 (Jan. 31, 2019), *available at* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#650.

11

assets of Venezuela are preserved for the country's people, rather than misused and diverted by former President Nicolas Maduro. Treasury will continue to use its economic tools to support Interim President Guaidó, the National Assembly, and the Venezuelan people's efforts to restore their democracy.[18]

As of the date of this decision, OFAC has not changed its position.

**D. The Guaidó Government Appoints Directors to the Managing Board of PDVSA.**

On February 5, 2019, the National Assembly approved and adopted a Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela (the "Transition Statute").[19] The Transition Statute was adopted to facilitate a "democratic transition" in Venezuela in three phases: (1) "End the dictatorial regime" of Maduro, (2) "Set up a provisional Government for national unity, to ensure that the democratic system is restored and free elections are called[;]" and (3) "Restore a democratic State by holding free, clear and fair elections in the shortest time possible."[20]

The Transition Statute identified Guaidó as "the legitimate President in Charge" of Venezuela.[21] It specifically empowered Guaidó to "appoint an *ad hoc*

---

[18] *Id.*

[19] Transition Statute (translated to English), Nachbar 7/11/19 Aff. Ex. C; *see also* Compl. Ex. P, Transition Statute (untranslated); Countercl. ¶ 18; Ans. to Countercl. ¶ 18. The Transition Statute spans seven chapters and thirty-nine articles.

[20] Transition Statute, at ch. I, art. 1, art. 7, Nachbar 7/11/19 Aff. Ex. C.

[21] *Id.* at ch. III, art. 14.

Managing Board" of PDVSA "to exercise PDVSA's rights as a shareholder of PDV Holding[.]"[22] The Transition Statute further directed the CITGO Entities to "have no relationship whatsoever" with Maduro and his regime.[23]

On February 8, 2019, pursuant to the authority granted him under the Transition Statute, Guaidó appointed five individuals as the *ad hoc* Managing Board of PDVSA "for the purpose of carrying out all necessary actions to appoint a Board of Directors" for PDV Holding.[24] On February 13, 2019, the National Assembly approved this action by resolution.[25]

On February 14, 2019, Venezuela's Constitutional Court, a subdivision of the Supreme Tribunal, issued a decision finding the Transition Statute unconstitutional and declaring the Transition Statute and the National Assembly resolution null and void.[26] The Constitutional Court found Guaidó's appointment of PDVSA's Managing Board unlawful and declared it a nullity.[27]

---

[22] *Id.* at ch. VII, art. 34; *see also* Countercl. ¶ 19; Ans. to Countercl. ¶ 19.

[23] Transition Statute, at ch. VII, art. 34 ¶ 3(b).

[24] *See* Decree of Juan Guaidó (Feb. 8, 2019), Nachbar 7/11/19 Aff. Ex. D. The Guaidó PDVSA Managing Board comprised Simón Antunes, Gustavo J. Velásquez, Carlos José Balza, Ricardo Alfredo Prada, and David Smolansky. *Id.* ¶ ONE.

[25] Resolution, Compl. Ex. Q.

[26] Decision of the Constitutional Court of the Supreme Tribunal, at 1, 8 (Feb. 14, 2019) (the "Constitutional Court Decision"), Compl. Ex. R.

[27] Constitutional Court Decision, at 9 (The National Assembly's resolution "includes appointments of authorities to the Board of Directors of PDVSA and of some of its Subsidiary Companies, which are NULL OF ABSOLUTE NULLITY." (emphasis omitted)).

### E. The Managing Board of PDVSA Reconstitutes the Boards of the CITGO Entities.

On February 15, 2019, the Guaidó-appointed Managing Board, acting for PDVSA as the sole stockholder of PDV Holding took action by a written consent pursuant to Section 228 of the Delaware General Corporation Law ("DGCL") to elect a new board of PDV Holding.[28]

Also on February 15, 2019, each member of the new PDV Holding board executed a unanimous written consent pursuant to Section 141(f) of the DGCL electing a new officer of PDV Holding.[29] That officer then caused PDV Holding to act by written consent as the sole stockholder of CITGO Holding to elect a new board of CITGO Holding.[30] The CITGO Holding board repeated the steps for CITGO Petroleum.[31]

The defendants allege (and the plaintiffs dispute) that the written stockholder consents electing the new boards of the CITGO Entities became effective on

---

[28] PDV Holding, Inc., Waiver of Notice and Written Consent of the Sole Stockholder in Lieu of a Special Meeting (Feb. 15, 2019), Nachbar 7/11/19 Aff. Ex. E.

[29] PDV Holding, Inc., Waiver of Notice and Unanimous Written Consent of the Board of Directors in Lieu of a Special Meeting (Feb. 15, 2019), Nachbar 7/11/19 Aff. Ex. F.

[30] CITGO Holding, Inc., Waiver of Notice and Written Consent of the Sole Stockholder in Lieu of a Special Meeting (Feb. 15, 2019), Nachbar 7/11/19 Aff. Ex. G.

[31] CITGO Holding, Inc., Waiver of Notice and Unanimous Written Consent of the Board of Directors in Lieu of a Special Meeting (Feb. 15, 2019), Nachbar 7/11/19 Aff. Ex. H; CITGO Petroleum Corporation, Waiver of Notice and Written Consent of the Sole Stockholder in Lieu of a Special Meeting (Feb. 15, 2019), Nachbar 7/11/19 Aff. Ex. I.

February 18, 2019, when each consent was delivered to the respective CITGO Entity.[32] The defendants also allege (and the plaintiffs dispute) that, at the end of this process, the new PDV Holding board comprised directors Luisa Palacios, Edgar Rincón, Fernando Vera, Elio Tortolero, and Andrés Padilla. The new CITGO Holding board comprised directors Palacios, Rincón, Ángel Olmeta, Javier Troconis, and Rick Esser. And the new CITGO Petroleum board comprised directors Palacios, Rincón, Luis Urdaneta, Olmeta, Padilla, and Esser.

## F. This Litigation

On June 25, 2019, the plaintiffs initiated this action pursuant to Section 225 of the DGCL claiming that they comprise the boards of each of the CITGO Entities. By statute, Section 225 actions are summary proceedings, so the plaintiffs moved for expedited proceedings contemporaneous with filing their complaint, and the defendants agreed to expedition. On July 9, 2019, the defendants answered and counterclaimed. That same day, the plaintiffs answered the counterclaim. Both sides moved for judgment on the pleadings, submitting cross-opening briefs on

---

[32] According to the *amicus curiae*, on April 10, 2019, by Presidential Decree approved by the National Assembly, Guaidó amended the February 8 decision creating the Guaidó Managing Board to ratify the creation of the Managing Board of PDV Holding and revoke Maduro's prior appointments to the PDVSA board of directors. *See* Dkt. 43, Br. of the Bolivarian Republic of Venezuela, as *Amicus Curiae*, In Supp. of Defs./Countercl.-Pls. ("Amicus Br."), at 9 (citations omitted).

July 11, 2019, and cross-answering briefs on July 16, 2019.[33] The Court heard oral argument on July 18, 2019.[34]

Before oral argument, but after the parties' second round of briefing, the Court granted Venezuela leave to participate as *amicus curiae* in support of the defendants' motion.[35] Filing an *amicus* brief after the submission of the parties' principle briefing is typical,[36] and permitting Venezuela to participate as an *amicus curiae* is consistent with well-settled law.[37] The plaintiffs did not contend otherwise. During oral argument, however, counsel for the plaintiffs expressed concern that they were unable to respond to the arguments made by the *amicus curiae*.[38] To address this concern, and to allow the parties to address legal authorities identified by the Court

---

[33] Dkt. 21, Pls.' Opening Br.; Dkt. 24, Defs.' and Countercl.-Pls.' Opening Br. in Supp. of Their Mot. for J. on the Pleadings ("Defs.' Opening Br."); Dkt. 35, Pls./Countercl. Defs.' Answering Br. in Opp'n to Defs. and Countercl.-Pls. Mot. for J. on the Pleadings ("Pls.' Ans. Br."); Dkt. 36, Defs. and Countercl.-Pls.' Corrected Reply Br. in Supp. of Their Mot. for J. on the Pleadings ("Defs.' Ans. Br.").

[34] Dkt. 55, Oral Arg. re Cross-Mots. for J. on the Pleadings (July 18, 2019) ("Oral Arg. Tr.").

[35] Dkt. 43, Amicus Br.

[36] *See generally* Del. Supr. Ct. R. 28.

[37] *See, e.g.*, Matteo Godi, *A Historical Perspective on Filings by Foreign Sovereigns at the U.S. Supreme Court: Amici or Inimici Curiae?*, 42 Yale J. Int'l L. 409, 441 (2017) (tracing common practice of foreign sovereigns filing amicus curiae briefs before the U.S. Supreme Court and concluding that "judicial openness to foreign sovereign amici is a longstanding institutional tradition of the Court").

[38] Oral Arg. Tr. at 7:18–9:3.

16

during argument,[39] the Court ordered another round of briefing post-argument, which was submitted on July 23, 2019.[40]

## II. LEGAL STANDARD

The parties cross-moved for judgment on the pleadings pursuant to Court of Chancery Rule 12(c). The Court will grant a Rule 12(c) motion "only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[41] In deciding cross motions for judgment on the pleadings, the Court will take the well-pleaded facts contained in the operative pleadings and "'view the facts pleaded and inferences to be drawn from such facts . . . in a light most favorable to the non-moving party.'"[42] The pleadings to which this Court may look are not limited to complaints or counterclaims, but also include answers and affirmative

---

[39] *Id.* at 34:10–37:6.

[40] Dkt. 51, Defs.' and Countercl.-Pls.' Suppl. Br. in Supp. of Their Mot. for J. on the Pleadings ("Defs.' Reply Br."); Dkt. 52, Pls./Countercl. Defs.' Reply Br. in Supp. of Their Mot. for J. on the Pleadings ("Pls.' Reply Br."). At the time of this decision, Venezuela and its state-owned entities were embroiled in litigation in other courts in this country. *See* Defs.' Opening Br. at 31–32 & n.9; Pls.' Ans. Br. at 38 n.9. *See, e.g.*, *PDVSA U.S. Litig. Tr. v. Lukoil Pan Ams. LLC*, 372 F. Supp. 3d 1353, 1362 (S.D. Fla. 2019); Order, *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, C.A. No. 18-7044 (D.C. Cir. May 1, 2019), Nachbar 7/11/19 Aff. Ex. U; Defs. Bariven S.A. and PDVSA Servs., B.V.'s Mot. to Substitute Counsel, *CLADirect, Inc. v. Bariven S.A.*, C.A. No. 4:19-cv-00553 (S.D. Tex. June 19, 2019), Nachbar 7/11/19 Aff. Ex. Z. Since the Executive Branch recognized Guaidó, no United States court has held that representatives of the Maduro regime may act for either the Venezuelan government or a Venezuelan state-owned enterprise in litigation.

[41] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[42] *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *3 (Del. Ch. Aug. 3, 2004) (quoting *Desert Equities*, 624 A.2d at 1205).

defenses.[43]  On a Rule 12(c) motion, the Court may consider documents integral to the pleadings,[44] including documents incorporated by reference and exhibits attached to the pleadings,[45] and facts subject to judicial notice.[46]

## III.  LEGAL ANALYSIS

The parties agree that the President of Venezuela has the power to select the members of the board of PDVSA, which in turn has the power to determine the boards of the CITGO Entities.  They disagree on three points.  First, they dispute who wields sovereign authority of the President of Venezuela, an issue that turns on the political question doctrine.  Second, they dispute whether Venezuela's sovereign authority properly reconstituted PDVSA's board, an issue that turns on the act of

---

[43] *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 130 (Del. Ch. 2009); *Lillis v. AT&T Corp.*, 896 A.2d 871, 876 n.9 (Del. Ch. 2005), *clarified*, 2005 WL 3111991 (Del. Ch. Nov. 17, 2005); Ct. Ch. R. 8(c).

[44] *Bakotic v. Bako Pathology LP*, 2018 WL 6601172, at *2 (Del. Super. Dec. 10, 2018) ("Where a document is integral to the pleadings, the court may consider it in deciding a Rule 12(c) motion without converting it to one for summary judgment."); *see also* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2019).

[45] *See Mehta v. Mobile Posse, Inc.*, 2019 WL 2025231, at *2 (Del. Ch. May 8, 2019) (considering exhibits attached to the defendants' answer on a motion for judgment on the pleadings); *Ketler v. PFPA, LLC*, 2015 WL 3540187, at *1 (Del. Super. June 3, 2015) (considering document attached to answer on motion for judgment on the pleadings and noting that "[e]xhibits to pleadings are considered part of the pleadings and therefore this motion does not convert to one for summary judgment"), *aff'd*, 132 A.3d 746 (Del. 2016)).

[46] Delaware Rule of Evidence 201 empowers the Court to "take judicial notice at any stage of the proceeding."  D.R.E. 201(d); *see also ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *2, *5 (Del. Ch. Nov. 30, 2017) (considering, on cross motions for partial judgment on the pleadings, facts "either not subject to reasonable dispute or subject to judicial notice").

18

state doctrine. Third, they dispute the ultimate question of who constitutes the CITGO Entities' respective boards, which turns on facts not before the Court at the pleading stage.

### A. Under the Political Question Doctrine, the U.S. President's Recognition of the Guaidó Government Binds This Court.

Under the political question doctrine, a decision to recognize a foreign sovereign presents a non-justiciable political question, because the recognition of a foreign sovereign is exclusively a function of the Executive Branch.[47] Applying this doctrine, the defendants contend that the Executive Branch's recognition of the Guaidó government is binding on this Court. And according to the defendants, invalidating Guaidó's actions to replace the PDVSA board would effectively undermine the Executive Branch's recognition of the Guaidó government. The defendants say that the plaintiffs' request for relief must therefore be denied. The plaintiffs respond that although the U.S. President issued a statement of recognition, that statement is limited on its face and does not support the defendants' requested relief.[48]

---

[47] *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964); *Guar. Tr. Co. v. United States*, 304 U.S. 126, 137–38 (1938).

[48] The plaintiffs also challenge the applicability of the political question doctrine. They contend that the internal affairs doctrine controls whether Maduro or Guaidó can determine the board of PDVSA. Pls.' Ans. Br. at 24. This argument is addressed *infra* § III.B(1).

19

As Chief Executive, the President of the United States is the "sole organ of the federal government in the field of international relations[,]"[49] and thus holds the exclusive power of recognition of a foreign government.[50] "Recognition is a 'formal acknowledgment' . . . 'that a particular regime is the effective government of a state.'"[51]  "The very purpose of the recognition by our government is that our nationals may be conclusively advised with what government they may safely carry on business transactions and who its representatives are."[52]  Recognition can be accomplished expressly through a statement of the Executive Branch or implicitly by receiving diplomatic representatives.[53]

---

[49] *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936).

[50] *Sabbatino*, 376 U.S. at 410 ("Political recognition is exclusively a function of the Executive."); *see also Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2086 (2015) ("Recognition is a topic on which the Nation must speak . . . with one voice. . . . [and] [t]hat voice must be the President's."). In *Zivotofsky*, the Court declined to opine that the "President has 'exclusive authority to conduct diplomatic relations,'" determining that a "formulation broader than the rule that the President alone determines what nations to formally recognize as legitimate—and that he consequently controls his statements on matters of recognition—presents different issues and [was] unnecessary to the resolution of this case." 135 S. Ct. at 2089.

[51] *Zivotofsky*, 135 S. Ct. at 2084 (quoting Restatement (Third) of Foreign Relations Law of the United States § 203 cmt. a (1986)).

[52] *Guar. Tr.*, 304 U.S. at 140.

[53] *See Zivotofsky*, 135 S. Ct. at 2084 ("Recognition is often effected by an express 'written or oral declaration.' It may also be implied—for example, by concluding a bilateral treaty or by sending or receiving diplomatic agents." (citations omitted)); *see also Ams. United for Separation of Church & State v. Reagan*, 786 F.2d 194, 202 (3d Cir. 1986) ("There is such a textually demonstrable commitment [in the Constitution] with respect to recognition of foreign states. Only the President has the power to 'receive Ambassadors and other public Ministers.'" (quoting U.S. Const. art. II, § 3)), *cert. denied*, 479 U.S. 1012 (1986; *cf.* Thomas Jefferson, *Jefferson's Opinion on the Powers of the Senate Respecting*

Given the exclusive nature of the Executive Branch's recognition authority, the Supreme Court of the United States has held that any decision by the Executive to recognize (or not recognize) a foreign government is a non-justiciable political question that federal and state courts must accept.[54]  The seminal Supreme Court decision on recognition of a foreign government, *Oetjen v. Central Leather Co.*, addressed the seizure of animal hides in Mexico by General Francisco Villa, a representative of the revolutionary government of Venustiano Carranza.[55]  General Villa seized the hides to satisfy an assessment imposed by the revolutionary regime, and the hides were ultimately sold to the defendant.[56]  The plaintiff brought suit claiming that the defendant lacked good title to the hides because General Villa had obtained them unlawfully.[57]  During the pendency of the action in the lower courts,

*Diplomatic Appointments, 24 April 1790*, Founders Online, National Archives ("The transaction of business with foreign nations is Executive altogether."), *available at* https://founders.archives.gov/documents/Jefferson/01-16-02-0215.

[54] *See, e.g.*, *Guar. Tr.*, 304 U.S. at 137–38 ("What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government. . . . Its action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts, which are bound to accept that determination, although they are free to draw for themselves its legal consequences in litigations pending before them."). *See also* Erwin Chemerinsky, Constitutional Law, Principles and Policies § 2.8, at 148 (5th ed. 2015) ("[T]he Supreme Court has held that the recognition of foreign governments is a political question . . . .  In other words, issues concerning who represents a foreign state, and in what capacity, are not justiciable.").

[55] 246 U.S. 297, 299–301 (1918).

[56] *Id.*

[57] *Id.* at 299.

21

the United States recognized the Carranza government as both the *de facto* and *de jure* government of Mexico,[58] which proved dispositive on appeal. The Supreme Court held:

> Who is the sovereign, de jure or de facto, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government. This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances.[59]

Applying that principle, the Court held that the Carranza government "must be accepted as the legitimate government of Mexico" and gave that conclusion retroactive effect.[60] The Court further invoked the act of state doctrine, a companion to the political question doctrine discussed more fully in the next section of this decision, to presume valid General Villa's actions in seizing the hides on behalf of the recognized Carranza government.[61]

*Oetjen* is well-settled law. Multiple decisions of the Supreme Court and lower courts have applied its holding.[62] Under *Oetjen* and its progeny, the applicable rule

---

[58] *Id*. at 301.

[59] *Id.* at 302 (citation and internal quotation marks omitted).

[60] *Id.* at 303.

[61] *See id.* at 303–04.

[62] *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 212 (1962) (noting that "recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called a republic of whose existence we know nothing" (citation and internal quotation marks omitted)); *United States v. Pink*, 315 U.S. 203, 229 (1942) ("What

is clear:  the Executive Branch's decision to recognize a foreign state "conclusively binds" all domestic courts, such that they must accept that decision.[63]  This decision calls for a straightforward application of that rule.

On January 23, 2019, the Executive Branch issued a statement "officially recognizing the President of the Venezuelan National Assembly, Juan Guaido, as the Interim President of Venezuela."[64]  That statement also described the National Assembly as "the *only* legitimate branch of government duly *elected* by the Venezuelan people[.]"[65]  The word "only" means "alone in a category" or to the

government is to be regarded here as a representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government."  (internal quotation marks omitted) (quoting *Guar. Tr.*, 304 U.S. at 137)); *Guar. Tr.*, 304 U.S. at 137 (explaining that recognition "is a political rather than a judicial question, and is to be determined by the political department of the government"); *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*, 2019 WL 3049034, at *13 (9th Cir. 2019) ("Who is the sovereign, de jure or de facto, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges."  (internal quotation marks omitted) (quoting *Oetjen*, 246 U.S. at 302)); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.21 (D.C. Cir. 1984) ("[T]he Court has made clear that the judiciary is not to second guess the determination of the other branches as to '[w]ho is the sovereign, *de jure* or *de facto*, of a territory.'" (quoting *Oetjen*, 246 U.S. at 302)), *cert. denied*, 470 U.S. 1003 (1985).  *See also United States v. Belmont*, 301 U.S. 324, 327 (1937) (following *Oetjen* and holding that "we are of opinion that no state policy can prevail against the international compact here involved").

[63] *Oetjen*, 246 U.S. at 302; *see also Guar. Tr.*, 304 U.S. at 137–38 (explaining that the political department's "action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts, which are bound to accept that determination, although they are free to draw for themselves its legal consequences in litigations pending before them.").

[64] January 23 Executive Statement at 1.

[65] *Id.* (emphasis added).

23

exclusion of others.[66] Thus, no other elected branch of government in Venezuela— not Maduro nor the Constituent Assembly—is legitimate in the eyes of the Executive Branch. The determinations of the Executive Branch are unambiguous: Guaidó is recognized, the National Assembly is legitimate, and neither Maduro nor the Constituent Assembly are legitimate parts of the Venezuelan government.

As their first line of defense, the plaintiffs quibble with the language of the January 23 statement. The plaintiffs describe the statement as having limited effect—neither elevating the Guaidó government to a superior position nor demoting the Maduro government to a subordinate role.[67] They note that the statement recognizes Guaidó as the "Interim President," not the President. To the plaintiffs, the word "interim" precludes Guaidó from "invok[ing] the powers that come with the title" of President.[68] They alternatively argue that the term "interim" renders the statement ambiguous, requiring further development of Venezuelan law on the

---

[66] *See, e.g.*, *Only*, Merriam-Webster Dictionary (defining "only" as "alone in a class or category"), *available at* https://www.merriam-webster.com/dictionary/only; *Only*, dictionary.com (defining "only" as "being the single one or the relatively few of the kind"), *available at* https://www.dictionary.com/browse/only?s=t; *Alone*, Merriam-Webster Dictionary (defining "alone" as "exclusive of anyone or anything else"), *available at* https://www.merriam-webster.com/dictionary/alone; *Alone*, dictionary.com (defining "alone" as "to the exclusion of all others or all else"), *available at* https://www.dictionary.com/browse/alone.

[67] *See* Pls.' Opening Br. at 26–27.

[68] *Id.* at 27.

meaning of "interim,"[69] and a review of the administrative construction of the Executive Branch's policy.[70] The plaintiffs next note that the January 23 statement declined to expressly "derecognize" the Maduro regime, which they argue is meaningful under foreign relations law.[71] To the plaintiffs, the Maduro regime is merely "non-recognized" in the eyes of the United States.[72]

None of these attempted distinctions have consequences for the issues before the Court. "Recognition" is a term of art used by the Executive Branch to identify a regime that "is the effective government of a state."[73] Regardless of what title Guaidó holds, Guaidó and his regime are the effective government of Venezuela. As important, no other regime in Venezuela is currently "recognized," even using the plaintiffs' preferred nomenclature. At present, therefore, it cannot be disputed that Guaidó is the voice of Venezuela's sole effective government as recognized by the U.S. President. This Court is bound by that determination.

**B.     Under the Act of State Doctrine, the Guaidó Government's Reconstitution of the PDVSA Board Is Valid.**

Recognition of Guaidó's government has significant consequences in this litigation because foreign sovereigns are entitled to the benefits of the act of state

---

[69] *See* Pls.' Reply Br. at 20.

[70] *See* Pls.' Ans. Br. at 31–36.

[71] Pls.' Reply Br. at 17–19.

[72] Oral Arg. Tr. at 89:3–13; *see also* Pls.' Opening Br. at 23; Pls.' Ans. Br. at 55.

[73] *Zivotofsky*, 135 S. Ct. at 2084.

doctrine.[74] That doctrine confers presumptive validity on official acts of a foreign sovereign performed within its own territory. In this case, it means that Guaidó's creation of the Managing Board of PDVSA is valid.

A product of federal common law,[75] the jurisprudential bases for the doctrine have evolved. The classic statement of the act of state doctrine is found in *Underhill*, which arose from a prior period of unrest in Venzuela.[76] In that case, the plaintiff was a U.S. citizen working in the Venezuelan city of Bolivar. When revolution

---

[74] *See Sabbatino*, 376 U.S. at 410–11 (noting that the United States maintained recognition of Cuba as a sovereign power despite severance of diplomatic relations, thereby requiring the U.S. Supreme Court to give deference to Cuba's acts of expropriation); *Pink*, 315 U.S. at 229–30 (noting that the United States' recognition of the Union of Soviet Socialist Republics as the *de jure* government of Russia requires withholding judgment on the Soviet government's actions); *Belmont*, 301 U.S. at 330 (taking judicial notice of the U.S. President's recognition of the Soviet government and validating all of its acts from the commencement of its existence); *Oetjen*, 246 U.S. at 301 (taking judicial notice of the United States' recognition of the government of Carranza as the *de facto* and then *de jure* government of Mexico and consequently refusing to sit in judgment on the Carranza government's revolutionary acts); *Underhill v. Hernandez*, 168 U.S. 250, 253–54 (1987) (noting the United States' recognition of the revolutionary government of Venezuela and refusing to adjudicate the revolutionary party's acts); *Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 672 (S.D. Fla. 1988) (noting the Executive Branch's recognition of the Delvalle government as the lawful government of the Republic of Panama and granting its actions deference under the act of state doctrine).

[75] Federal law governs the analysis in this case. *See Sabbatino*, 376 U.S. at 425; *Modern Status*, 12 A.L.R. Fed. 707 § 4 (1972) (cited as "Modern Status") § 4 ("Questions as to the applicability of the Act of State Doctrine in any given situation are to be determined exclusively by reference to federal law, and any state laws of policies in conflict therewith are to be disregarded.").

[76] 168 U.S. at 252. *See also D'Angelo v. Petroleos Mexicanos*, 317 A.2d 38, 40 (Del. Ch. 1973) (citing *Underhill*, 168 U.S. at 252), *rev'd on other grounds*, 331 A.2d 388 (Del. 1974) (reversing the trial court's holding that the act of state doctrine deprived it of subject matter jurisdiction).

erupted, he was physically detained in Bolivar by revolutionary forces. Upon returning to the United States, he brought claims sounding in tort against his captors. The revolutionary forces were ultimately successful and subsequently recognized by the United States. The Supreme Court of the United States held that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory."[77] Applying this rule, the Court found in favor of the defendant, holding that the decision to detain the plaintiff was a presumptively valid act of a recognized sovereign.

The Supreme Court of the United States reexamined and reformulated the act of state doctrine in *Sabbatino*.[78] *Sabbatino* involved a dispute over the proceeds from the sale of sugar cargo, which had belonged to an American-owned company, but which the Cuban government confiscated while the cargo was in Cuban waters.[79] The defendants argued that the act of confiscation violated international law and was thus not entitled to deference under the act of state doctrine. To address this argument, the Court revisited the jurisprudential bases of the doctrine.

---

[77] *Underhill*, 168 U.S. at 252.

[78] 376 U.S. 398.

[79] *Id.* at 404–406.

*Underhill* and intervening cases had articulated the act of state doctrine as an expression of comity and international law.[80] The Court in *Sabbatino* rejected that theory,[81] recasting the doctrine as arising from "constitutional underpinnings," or "the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations."[82] As part of the family of theories derived from separation of powers principles, the act of state doctrine overrides otherwise binding law, including state and international law. The *Sabbatino* decision explained that the Judicial Branch

> will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, *even if the*

---

[80] 168 U.S. at 252 ("Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."); *Oetjen*, 246 U.S. at 304–05 ("The principle that the conduct of one independent government cannot be successfully questioned in the courts of another . . . rests at last upon the highest considerations of international comity and expediency.").

[81] 376 U.S. at 421 ("We do not believe that this doctrine is compelled either by the inherent nature of sovereign authority, as some of the earlier decision[s] seem to imply, see *Underhill*, . . . or by some principle of international law.").

[82] *Id.* at 423. *See generally W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) ("This Court's description of the jurisprudential foundation for the act of state doctrine has undergone some evolution over the years. We once viewed the doctrine as an expression of international law, resting upon 'the highest considerations of international comity and expediency[.]' We have more recently described it, however, as a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs[.]" (citations omitted)).

> *complaint alleges that the taking violates customary international law.*[83]

The Supreme Court of the United States had occasion to reexamine the act of state doctrine in *W.S. Kirkpatrick*, further clarifying its operation in two significant ways. The Court first distinguished the act of state doctrine from the political question and sovereign immunity doctrines, holding that "[t]he act of state doctrine is not some vague doctrine of abstention but a '*principle of decision* binding on federal and state courts alike.'"[84] The Court next clarified the scope of official acts protected by the doctrine. Before *W.S. Kirkpatrick*, U.S. Supreme Court cases applying the act of state doctrine involved acts of expropriation by foreign governments, leaving open the question of whether the Court would apply the doctrine to other actions. In *W.S. Kirkpatrick*, the Supreme Court described the doctrine as applying to any "*official act* of a foreign sovereign performed within its own territory."[85]

---

[83] 376 U.S. at 428 (emphasis added).

[84] 493 U.S. at 406 (emphasis in original).

[85] *Id.* at 405 (emphasis added). Tracing the developments of *W.S. Kirkpatrick*, the Restatement of Foreign Relations was revised in 2018 to describe the doctrine as a "principle of decision" and make clear that it applies to all "official acts." *See* Restatement (Fourth) of Foreign Relations Law of the United States § 441 cmt. a (2018) (The act of state doctrine "operates as a special choice-of-law rule in that it precludes a court from denying effect to an official act on the ground that the act violates the public policy of the forum. The doctrine is not jurisdictional but rather provides a rule of decision in cases when a court has jurisdiction over a case."); *see also id.* at reporters' n.1 ("Although the holding of *Sabbatino* was limited to questions of the title to property, both the language of the

In sum, in its modern form, the act of state doctrine derives from the principle of separation of powers. It applies to a multitude of foreign acts performed by recognized sovereigns within territorial limits. Once applied, the doctrine requires the Court to assume the validity of the official act in question.

In this case, the act of state doctrine resolves the question of who constitutes the PDVSA board. The Guaidó government's reconstitution of the PDVSA board was the official act of a recognized sovereign taken wholly within its own territory. Under the act of state doctrine, this Court must accept that action as valid without further inquiry.

The plaintiffs make three arguments in response, none of which are convincing. The plaintiffs first dispute the applicability of the act of state doctrine, contending generally that Guaidó's actions in appointing the PDVSA board should be reviewed on their merits under Venezuela law in accordance with the internal affairs doctrine. The plaintiffs next contend that a party seeking the privileges of a "state" for invoking the act of state doctrine must have control over a recognized territory.[86] According to the plaintiffs, the Guaidó government in fact controls no

---

opinion and later decisions indicate that the doctrine applies to official sovereign acts generally, not just to those addressing property rights.").

[86] Pls.' Ans. Br. at 45–46 (citing *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892, 909, 911 (S.D.N.Y. 1968), *aff'd as modified sub nom. Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686 (2d Cir. 1970)).

territory or people, and thus should not be granted the presumptions of sovereignty.[87] The plaintiffs further dispute the territorial effect of the action in question, contending that it operated outside of Venezuela and that the Court may not apply the doctrine to actions by a state "designed largely to have an effect outside the territory of a foreign state."[88]

### 1. The act of state doctrine overrides the internal affairs doctrine.

As their first argument against the act of state doctrine, the plaintiffs turn to the internal affairs doctrine. The plaintiffs describe the internal affairs doctrine as "dominant," "firmly established," and "rare[ly]" excepted,[89] then argue that it renders Venezuelan law as controlling for determining the proper composition of the PDVSA board.[90] They further contend the Constitutional Court already determined that under Venezuelan law, the plaintiffs prevail.[91] The plaintiffs view the internal affairs doctrine as trumping the act of state doctrine, when the opposite is true.

---

[87] *Id.* at 4.

[88] *Id.* at 46 (citing *Carl Zeiss Stiftung*, 293 F. Supp. at 909; *Latvian State Cargo & Passenger S.S. Line v. McGrath*, 188 F.2d 1000, 1002 (D.C. Cir. 1951)).

[89] Pls.' Opening Br. at 15–16 (citing *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081 (Del. 2011); *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 958 (Del. Ch. 2007); *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005)).

[90] *See id.* at 19–20 (quoting *Palmer v. Arden-Mayfair, Inc.*, 1978 WL 2506, at *9 (Del. Ch. July 6, 1978) as stating: "[T]he method of electing directors and the regulation of directors' terms in office represent internal affairs of a corporation.")).

[91] *See id.* at 20–22.

31

The U.S. Supreme Court has declared the act of state doctrine to be a principle of federal common law that overrides any state or international interest.[92] Before *Sabbatino*, discussed above, states applied their own law to deem ineffective takings by foreign sovereigns.[93] New York in particular enacted codes to implement the public policy of the state not to enforce foreign confiscatory decrees and expropriations.[94] *Sabbatino* held that "ordering our relationships with other members of the international community must be treated *exclusively as an aspect of federal law*,"[95] and that the act of state doctrine applies even if the act violates state or "customary international law."[96] As a result, federal law governs and precludes the application of state laws or policies when they conflict with the act of state doctrine.[97] This is true despite the multitude of sins that can trigger the application

---

[92] *See Sabbatino*, 376 U.S. at 425 ("[A]n issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law."); *see also id.* at 431 ("[T]he act of state doctrine is applicable even if international law has been violated."); Restatement (Fourth) of Foreign Relations Law of the United States § 441 cmt. b (2018) ("The act of state doctrine constitutes federal common law that, when it applies, overrides any contrary rule of State law.").

[93] *Modern Status*, 12 A.L.R. Fed. 707 § 4.

[94] *Id.* § 4 n.54.

[95] 376 U.S. at 425 (emphasis added).

[96] *Id.* at 428.

[97] *See Modern Status*, 12 A.L.R. Fed. 707 § 4. ("[A]ny state law or policy in conflict with the federal law on this subject should be disregarded, regardless of whether the court in which the case was being heard was a state or federal court.").

of the act of state doctrine, ranging from expropriation of assets to denials of personal rights and freedoms.[98]

On the priority ascribed to the act of state doctrine, the *Air Panama* decision is particularly instructive.[99] In 1988, General Manuel Antonio Noriega refused to step down as Commander of the Panamanian defense forces, then caused Panama's legislature to attempt to remove Panama's recognized sovereign, President Eric Arturo Delvalle. Within weeks of the attempted coup, the Noriega regime replaced the board and executives of Air Panama, a corporation wholly owned by the Republic of Panama. In response, Delvalle appointed a new board and commenced litigation to have his appointments declared valid. Noriega's appointees argued that Panamanian law controlled the dispute and favored their position. The court disagreed, holding that the act of state doctrine took primacy:

> The act of state doctrine . . . *obviates the need for the Court to inquire into private Panamanian law*. The appointments by President Delvalle and Ambassador Sosa to the management of Air Panama are acts of state, that is, they are acts by the sovereign state of Panama, performed within the territory of Panama. Accordingly, these acts of state must be accepted by this Court as valid. *Judicial*

---

[98] *See generally Modern Status*, 12 A.L.R. Fed. 707, at Part III, Particular Factual Situations.

[99] *Air Panama*, 745 F. Supp. at 673 ("This is not a dispute between private creditors over which creditor owns a piece of airline equipment. Here, it is clear that the Republic of Panama owns Air Panama. Instead, the issue presented is which rival government properly represents the Republic of Panama in the United States. That issue is to be determined not under Panamanian law governing private corporations, but under the foreign relations law of the United States." (footnote omitted)).

*inquiry into the law of the sovereign state underlying these acts is neither necessary nor appropriate*[.][100]

In accordance with *Sabbatino*, and just as in *Air Panama*, the act of state doctrine takes priority over the internal affairs doctrine. Evaluating the Guaidó government's acts under Venezuelan or other law is neither necessary nor appropriate.[101]

---

[100] *Id.* (emphasis added); *see also Sabbatino*, 376 U.S. at 415 & n.17 (invoking the act of state doctrine and noting that "[t]he courts below properly declined to determine if [Cuba's] issuance of the expropriation decree complied with the formal requisites of Cuban law"); *Banco de Espana v. Fed. Reserve Bank of NY*, 114 F.2d 438, 443–44 (2d Cir. 1940) ("[T]he question of the validity under Spanish law . . . is not open to examination by us. . . . So long as the act is the act of the foreign sovereign, it matters not how grossly the sovereign has transgressed its own laws. Hence the affidavits presented on behalf of plaintiff as to the correct interpretation of Spanish law do not avail to prevent summary judgment."); *Reavis v. Exxon Corp.*, 396 N.Y.S.2d 774, 90 Misc. 2d 980, 990 (N.Y. Sup. Ct. 1977) (the act of state "doctrine does not bar inquiry into what the Venezuelan government in fact did; but it does bar judicial consideration of whether what it did was in violation of its own or international law").

[101] In case this court were to rule otherwise, the defendants argued that the Venezuelan Constitutional Court's decision is unworthy of deference, and they invoke a series of multi-factored tests for recognizing foreign judgments under federal and Delaware law. *See* Defs.' Ans. Br. 19–26. This decision need not conduct this analysis, as the act of state doctrine resolves this issue. The act of state doctrine requires that this court assume the official act of the Guaidó government as valid, precluding this court from giving deference to the Constitutional Court's ruling purporting to invalidate the Guaidó government's appointments to the PDVSA board. Moreover, as discussed *infra* nn.120–21, the recognition of one sovereign government must be construed to exclude other bodies, including legal tribunals, from purporting to wield authority on behalf of a different government. Underscoring this point, the U.S. Executive Branch has taken the extraordinary step of declaring the Constitutional Court of Venezuela to be illegitimate and sanctioning the members of that tribunal. Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice (May 18, 2017), *available at* https://www.treasury.gov/press-center/press-releases/Pages/sm0090.aspx.

## 2. The Guaidó government qualifies as a state for the purposes of the act of state doctrine.

The plaintiffs next argue that the Guaidó government in fact does not control any territory or a people and therefore does not qualify as a state for purposes of the act of state doctrine. The plaintiffs cite authorities for the proposition that "[o]ne of the fundamental conditions of the 'act of state' doctrine is that the foreign state whose act is involved have a clearly recognizable jurisdictional basis for its action, usually one based on territorial control over the subject of its action."[102] The plaintiffs transmute this general statement into a new rule, arguing that the Executive's recognition of a *de jure* government is not sufficient to satisfy the act of state doctrine. They contend that a government *must* exercise actual control over its sovereign territory for the act of state doctrine to apply. They go so far as to say that "[n]o court has extended the act of state doctrine to *de jure* governments that do not have [these] characteristics . . . ."[103] One need not look far to prove the plaintiffs' statement wrong.

While criteria such as territorial control may sometimes be relevant to evaluating the concept of *de facto* statehood, the principal and frequently dispositive question for purposes of the act of state doctrine is whether the foreign sovereign

---

[102] Pls.' Ans. Br. at 45 (quoting *Carl Zeiss*, 293 F. Supp. at 910); Pls.' Reply Br. at 7 (same).
[103] Pls.' Reply. Br. at 9.

has received *de jure* recognition by the United States.[104]  On this issue, the Supreme

Court of the United States has spoken unequivocally:  The political question doctrine

makes recognition of a foreign government "conclusive on all domestic courts,

which are bound to accept that determination[.]"[105]     This well-settled

pronouncement does not permit domestic courts to ignore the Executive Branch's *de*

*jure* recognition based on its own assessment of a foreign sovereign's *de facto*

control.

Once again, *Air Panama* is on point.  In that case, the recognized Delvalle

government had been displaced by a military coup and lacked control over the

---

[104] *See generally Sabbatino*, 376 U.S. at 428 (1964) ("[T]he (Judicial Branch) will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and *recognized by this country at the time of suit*[.]" (emphasis added)); *Pink*, 315 U.S. at 233 ("[W]hen a revolutionary government is recognized as a de jure government, 'such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence.'"); *Modern Status*, 12 A.L.R. Fed. 707 § 8[a] (1972) ("It is clear that, like beauty, sovereignty is in the eye of the beholder.  Even though a government may exercise in a particular territory all of the incidents of sovereignty and may in fact be unquestionably supreme there, its sovereignty, or lack of it, in the eyes of other nations depends in international law on the recognition extended or not extended to it by such other nations.  Thus . . . the applicability or non-applicability of the Act of State Doctrine in United States courts in any given situation depends in large part on *whether or not the United States has extended recognition to the acting state*." (emphasis added) (footnote omitted)).

[105] 304 U.S. at 138.  *See also Crystallex*, -- F.3d --, 2019 WL 3403888 at *4 n.2 (finding that although "there is reason to believe that Guaidó's regime does not have meaningful control over Venezuela or its principal instrumentalities such as PDVSA[,] . . . under *Guaranty Trust Co. v. United States*[, 304 U.S. 126, 138 (1938)], we recognize Guaidó's regime as authorized to speak and act on behalf of Venezuela in these appeals").

corporate assets at issue.[106] In applying the act of state doctrine, the court did not evaluate the scope of territory actually controlled by the Delvalle government. Rather, the court explained that it must give "complete judicial deference"[107] to and was "conclusively b[ou]nd" by the decision of the Executive Branch to recognize the Delvalle government.[108] This principle governed all aspects of the court's analysis.[109]

The act of state doctrine even extends to decrees by recognized governments in exile that control no territory. For example, prior to Franklin D. Roosevelt's 1933 decision to recognize the Soviet Union, the United States recognized Russia's provisional government located in the United States and led by Alexander Kerensky.[110] The provisional government held no territory but, solely due to recognition, had the right to appear in United States courts.[111] This recognition validated the provisional government's representation of Russian interests in the United States.[112] It was only after President Roosevelt's *de jure* recognition of the

---

[106] 745 F. Supp. at 671 ("the Noriega regime took control of Air Panama's operations").

[107] *Id.* at 672 (citing *Pfizer Inc. v. Gov't of India*, 434 U.S. 308, 320 (1978)).

[108] *Id.* (alteration in original) (citing *Pink*, 315 U.S. at 223).

[109] *Id.* at 672–73.

[110] *See generally Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396, 400 (2d Cir. 1927) (explaining the history of recognition of the provisional Russian Government and reciting the act of state doctrine).

[111] *Id.*

[112] *Id.*

Soviet Union that its representatives had authority to act in pursuit of the Russian government's interests in United States courts.[113]

The plaintiffs' authorities do not aid their cause. They invoke cases where the *de jure* sovereign exercised *de facto* control over its territory.[114] But that unsurprising correlation does not render *de facto* control a prerequisite to applying the act of state doctrine, and none of the supplied authorities states anything to the contrary.[115]

---

[113] *Compare Sokoloff v. Nat'l City Bank of New York*, 199 N.Y.S. 355, 358 (N.Y. Sup. Ct. 1922) ("The Soviet government of Russia has never been recognized by our government; hence we may not ascribe any of the attributes of sovereignty to it. It follows that all the acts of that government in contemplation of American courts are ineffective, without consent of the parties concerned, to create, transfer, or nullify legal obligations."), *aff'd*, 239 N.Y. 158 (1924), *with State of Russia v. Nat'l City Bank of New York*, 69 F.2d 44, 45 (2d Cir. 1934) (finding that post-recognition representatives of the Soviet Union now possessed the authority to assign claims on behalf of their government). *See also State of the Netherlands v. Fed. Reserve Bank*, 201 F.2d 455, 456, 462–63 (2d Cir. 1953) (upholding ownership rights of the Netherlands' government-in-exile based on a royal decree, when at the time of the decree, the Netherlands' government had fled to England, where it was recognized by the United States, and did not control any territory of people in the Netherlands).

[114] *See* Pls.' Reply Br. at 9 (citing *Sabbatino*, 376 U.S. at 404; *Oetjen*, 246 U.S. at 303; *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 306 (1918); *Underhill*, 168 U.S. at 252; *Banco Nacional de Cuba v. First Nat'l City Bank of New York*, 431 F.2d 394, 399 (2d Cir. 1970), *vacated sub nom. First Nat'l City Bank v. Banco Nacional De Cuba.*, 400 U.S. 1019 (1971); *Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 49–50 (2d Cir. 1965); *Union Shipping & Trading Co. v. United States*, 127 F.2d 771, 774 (2d Cir. 1942); *Capitol Records v. Mercury Record Corp.*, 109 F. Supp. 330, 343 (S.D.N.Y. 1952), *aff'd sub nom. Capitol Records v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955); *E. States Petroleum Co. v. Asiatic Petroleum Corp.*, 28 F. Supp. 279, 280-81 (S.D.N.Y. 1939)).

[115] *See supra* n.114. The plaintiffs also cite *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 289 (1st Cir. 2005). Pls.' Reply Br. at 8–9. In that case, the Palestinean Liberation Organization asserted a defense of sovereign immunity, which depended on their argument that Palestine qualified as a "state." 402 F.3d at 288. Because Palestine was not recognized

At base, the plaintiffs invite a collateral attack on the Executive Branch's decision to recognize the Guaidó government.[116] The act of state doctrine "arises out of the basic relationships between branches of government in a system of separation of powers."[117] It reflects the "proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs."[118] A rule requiring courts to ignore *de jure* recognition and instead apply subjective criteria of statehood would invite courts to second guess the determinations properly vested within the Executive Branch. Such a rule would allow for multiple and potentially divergent rulings where this nation must speak with "one voice."[119] Courts have consistently rejected that kind of judicial scrutiny in this sphere.

Thus, although the Guaidó government's *de facto* control over territory and people has momentous implications beyond these pages, it does not matter for the

---

by the Executive Branch as a state, the court drew upon principles of international law to evaluate this defense. *Id.* at 284 n.6. Under both the recognition test and the restatement standard, Palestine did not meet the requirements for statehood and the court denied application of the sovereign immunity defense. *Id.* In this case, the Executive Branch has formally recognized the Guaidó government and this Court will not use alternative tests to second guess the Executive Branch's recognition of a foreign government.

[116] The plaintiffs are not subtle in this regard. *See, e.g.*, Pls.' Reply Br. at 5 ("[T]he Executive Statement defied prior practice complicating the Court's job. The Executive Statement does not follow international law.").

[117] *Sabbatino*, 376 U.S. at 423.

[118] *Id.* at 427–28.

[119] *See also Zivotofsky*, 135 S. Ct. at 2086; *Sabbatino*, 376 U.S. at 410.

purpose of this legal analysis.  The Executive's *de jure* recognition of the Guaidó

government standing alone establishes statehood sufficient to invoke the act of state

doctrine.

The plaintiffs alternatively contend that the actions of Maduro's regime,

which they characterize as "non-recognized" or "unrecognized," are equally entitled

to presumptions of validity under the act of state doctrine.  According to at least one

articulation of black letter law, however, a "state derecognizes a regime when it

recognizes another regime as the government."[120]  This concept is sound.  Applying

the act of state doctrine to the actions of multiple, competing sovereigns would

undermine the purpose of recognition, which is to identify the singular authority with

whom this nation and nationals may engage.[121]  Accordingly, recognition of one

sovereign authority must exclude others, particularly when those other bodies have

taken positions contrary to the recognized sovereign.  Thus, the recognition of the

---

[120] Restatement (Third) of the Foreign Relations Law of the United States § 203 cmt. f (1986).  *See also Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551, 553 (2d Cir. 1988) ("[A] state *derecognizes* a governmental regime when it recognizes another regime as the legitimate government of that state." (quoting Restatement (Third) of the Foreign Relations Law of the United States § 203 cmt. f (1987))); 2 Ved P. Nanda et al., *Litigation of International Disputes in U.S. Courts* § 11.11 (2019) ("Where the United States recognizes the governmental regime regarding the territory of a state, it necessarily 'derecognizes' the governmental regime that it had previously recognized with respect to that territory." (citing *M/T Stolt Sheaf*, 860 F.2d at 553)).

[121] *See Guar. Tr.*, 304 U.S. at 140.  *See also Zivotofsky*, 135 S. Ct. at 2086 ("Recognition is a topic on which the Nation must speak . . . with one voice." (internal quotation marks omitted)).

Guaidó government effectively derecognized the Maduro regime, and the plaintiffs' arguments based on non-recognition fail.[122]

### 3. The relevant act was accomplished within Venezuela's sovereign territory.

Last, the plaintiffs argue that the official act did not occur within Venezuela's sovereign territory because it had extraterritorial effects precluding application of the act of state doctrine. To be clear, the relevant "official act" is Guaidó's appointments to the PDVSA board, and the plaintiffs do not argue that this act occurred outside of Venezuela's territorial limits, nor could they.[123] The plaintiffs instead argue that because the National Assembly directed the Guaidó government to replace the PDVSA board "for the purpose" of reconstituting the boards of Delaware corporations headquartered in Houston, the primary effect of the official act took place outside of Venezuela.

Although no U.S. Supreme Court case has directly addressed this defense, lower courts have rejected it. For example, in *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, the plaintiff alleged that the defendants engaged in a

---

[122] *See also supra* n.8, Sec. Pompeo Statement ("The United States stands with interim President Juan Guaido . . . . The United States *does not recognize the Maduro regime* as the government of Venezuela." (emphasis added)).

[123] *See generally* Pls.' Opening Br. at 15–22 (arguing that the appointment of the PDVSA board concerns the internal affairs of a Venezuelan entity and is thus subject to Venezuela law).

boycott designed to deny the plaintiff oil needed for its operations.[124] The defendants did not deny that they refused to do business with the plaintiff, but they argued that the Venezuelan government forbade them from doing business with the plaintiff in a presumptively valid act of state.[125] The federal district court found in favor of the defendants under the act of state doctrine. The court held that regulating trade within one's borders qualifies as an act of state, even if the effect is compulsive and fell outside of the acting state's jurisdiction.[126]

None of the authorities on which the plaintiffs rely support the proposition that an extraterritorial *effect* of an official act can alone preclude application of the doctrine.[127] Rather, most of the plaintiffs' authorities address how to apply territorial

---

[124] 307 F. Supp. 1291, 1292 (D. Del. 1970).

[125] *Id.* at 1297–99.

[126] *Id*. at 1298–99. *See also Carl Zeiss*, 293 F. Supp. at 911 (holding the Wuerttemberg Acts of 1949, 1954, and 1967 valid under the act of state doctrine as to matters within West Germany's territorial jurisdiction, explaining that "the mere fact that the foreign state's act, in addition to regulating matters within its territorial jurisdiction, may have some indirect impact outside its territory, does not preclude our treatment of it as an 'act of state'"); *Air Panama*, 745 F. Supp. at 673 n.4 (holding board and management appointments to be valid under the act of state doctrine where such appointments were made for the purpose of controlling assets located in the United States, notwithstanding the significant extraterritorial effects); *In re Philippine Nat'l Bank*, 397 F.3d 768, 773 (9th Cir. 2005) (explaining that "even when an act of a foreign state affects property outside of its territory, 'the considerations underlying the act of state doctrine may still be present'"); *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 53 (S.D.N.Y. 2015) (holding that Cuba's confiscation of funds held in U.S. banks did *not* exceed extraterritorial limitations, despite the extraterritorial effects, and permitting the petitioner to recover against those funds as payment for a $100 million judgment against Cuba).

[127] *See* Pls.' Ans. Br. at 46 (citing cases); Pls.' Reply Br. at 11–14 (citing authorities).

limitations to official acts involving intangible property. In each decision, the court analyzed the fictional situs of the intangible property (trademarks or debt) to determine whether the official act exceeded the sovereign's territorial domain for the purpose of the act of state doctrine.[128] In each decision, the legal situs of the intangible property determined whether the act of state doctrine applied. The courts did not need to look to or analyze the effects of the official act at issue.

To be sure, dictum in one of the plaintiffs' authorities provides a non-frivolous foothold for the plaintiffs' theory. *Allied Bank* refers to the "effects" of the official act when addressing territorial limits, stating that "[a]cts of foreign governments purporting to have extraterritorial *effect* . . . by definition, fall[] outside the scope of the act of state doctrine . . . ."[129] This reference to "effects," found in a transitional

---

[128] *Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co.*, 392 F.2d 706 (5th Cir. 1968) (declining to apply the act of state doctrine where the legal situs of the intangible property at issue, debt, was the U.S.); *Republic of Iraq*, 353 F.2d at 51 (declining to apply the act of state doctrine where the legal situs of the intangible property at issue, debt and stock, was Canada and not Iraq); *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985) (declining to apply the act of state doctrine where the legal situs of the intangible property at issue, debt, was the U.S.); *Zwack v. Kraus Bros. & Co.*, 237 F.2d 255, 261 (2d Cir. 1956) (declining to apply the act of state doctrine where the legal situs of the intangible property at issue, a trademark, was the U.S.); *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 61 F. Supp. 3d 372, 390–91 (S.D.N.Y. 2014) (declining to apply the act of state doctrine where the legal situs of the intangible property at issue, a trademark, was the U.S.), *aff'd in part, vacated in part*, 809 F.3d 737 (2d Cir. 2016); *Gonzalez v. Indus. Bank (of Cuba)*, 186 N.E.2d 410, 412 (N.Y. 1962) (declining to apply the act of state doctrine where the legal situs of the intangible property at issue, debt, was the U.S.), *reargument denied, remittitur amended*, 187 N.E.2d 465 (N.Y. 1962).

[129] 757 F.2d at 522 (emphasis added).

43

sentence, does not refer to or form the basis of any analysis, and it is purely dictum. The quote lacks any theoretical foundation within the decision itself or case law generally.[130]

In this case, the official act is the replacement of the PDVSA board. That act occurred within Venezuela's territorial boundaries and the plaintiffs do not contend otherwise. The knock-on effects of that act which took place outside of Venezuela do not render the original act extraterritorial.

---

[130] Similarly, *Republic of Iraq* describes one of the principle questions raised in that case as whether the act of state doctrine applies "to foreign confiscation decrees purporting to *affect* property within the United States." 353 F.2d at 50 (emphasis added). The decision repeats its reference to "affect" in explaining the theoretical bases for the act of state doctrine. *Id.* (explaining that "the exercise of discretion whether or not to respect a foreign act of state *affecting* property in the United States is closely tied to our foreign affairs, with consequent need for nationwide uniformity" (emphasis added)). Application of the act of state doctrine in that case, however, turned on the legal situs of the property at issue, not the effects of the foreign decree. Confusing matters more, after finding that the official action was extraterritorial, that decision conducted a second step analysis examining whether the foreign decree conformed to U.S. laws and policy. *See generally* Restatement (Second) of Foreign Relations § 43 (1965). Revisions to the Restatement of Foreign Relations appear to have eliminated that second step in the analysis. *See, e.g.*, Restatement (Third) of Foreign Relations § 443, reporters' n.13 (1987). In any event, in this case, because the official act at issue is within Venezuela's territorial domain, it is unnecessary to conduct the second step analysis.

The plaintiffs also describe a portion of the *Carl Zeiss* decision as supportive of their effects analysis, but it is not. 293 F. Supp. at 909–11 (cited at Pls.' Ans. Br. at 46–46 & Pls.' Reply Br. 7–8). In that case, one of the West German government's acts at issue purported to terminate the East German domicile of a foundation. *Id.* at 911. The court held that the act was valid as to matters within West Germany, but not as to matters within East Germany, because East Germany was not within the recognized sovereign territory of the West German government. *Id.* In reaching this conclusion, the court emphasized that any effects in East Germany did not undermine the validity of the acts as to matter within West Germany. *Id.* By analogy, in this case, any effects outside of Venezuela do not undermine the validity of the Guaidó government's acts as to matters within Venezuela.

44

## C. This Decision Does Not Resolve Who Constitutes the Boards of the CITGO Entities.

Because Guaidó's appointment of directors to PDVSA's Managing Board is valid, the defendants argue that they are entitled to a declaration that the written consents electing new boards of the CITGO Entities are also valid.[131] The defendants did not attach the written consents at issue to their counterclaims. They provided those documents to the plaintiffs in connection with briefing on their motion for judgment on the pleadings.[132] The Court, therefore, cannot consider these documents on a motion pursuant to Rule 12(c). Because the defendants present documents outside of the pleadings in support of their motion, the defendants' motion will be treated as one for summary judgment under Rule 56.[133]

The plaintiffs did not identify any deficiencies in the stockholder consents in their answering brief, at oral argument, or in their supplemental brief submitted after argument.[134] Instead, the plaintiffs complained that they had limited time to review

---

[131] Defs.' Opening Br. at 42–48.

[132] *See* Nachbar 7/11/19 Aff. Before that time, the plaintiffs denied allegations in the defendants' counterclaims concerning the written consents. *See* Ans. to Countercl. ¶¶ 21–26 (stating that the plaintiffs had "not received the [written consents] and had no involvement in [their] drafting, signature, or delivery" and were "without knowledge or information sufficient to admit or deny [their] contents").

[133] Ct. Ch. R. 12(c).

[134] The written consents appear to conform to the requirements of Section 228 of the DGCL. *See generally* Defs.' Opening Br. at 44–48.

the documents.[135] The plaintiffs have now had ample time to review the documents. The plaintiffs shall submit an affidavit pursuant to Rule 56(e) within ten days from the date of this decision.[136]

## IV.  CONCLUSION

For the foregoing reasons, the cross motions for judgment on the pleadings are converted into cross motions for summary judgment.  Resolution of those motions is stayed to permit the plaintiffs to submit an affidavit pursuant to Rule 56(e).

---

[135] Pls.' Ans. Br. at 11–12.

[136] The signatures on the stockholder consents render them presumptively valid under Delaware law.  *See Parshalle v. Roy*, 567 A.2d 19, 27 (Del. Ch. 1989) (noting that stockholder proxies are presumptively valid "by the stockholder affixing his signature on the proxy").  Generally, this Court will not look beyond the face of a consent to determine its validity unless the party disputing its validity provides some reason for doing so.  *See, e.g.*, *Flaa v. Montano*, 2013 WL 5498045, at \*6–8 (Del. Ch. Oct. 4, 2013) (looking to extrinsic evidence to resolve challenge to the authority of the executor of the consent).  *See also Mainiero v. Microbyx Corp.*, 699 A.2d 320, 323 (Del. Ch. 1996).  The plaintiffs do not appear to contest the authority of the signatories to the consents, aside from their challenge at the level of the PDVSA board, which this decision resolves as a matter of law.  *See* Pls.' Opening Br. at 7 (conceding that "[t]he President of PDV Holding has the general authority to act in the name of the company, which includes executing written consents on behalf of PDV Holding"); *id.* (conceding that "[t]he President of CITGO Holding has the general authority to act in the name of the company, which includes executing written consents on behalf of CTIGO Petroleum").  Accordingly, the plaintiffs are not entitled to discovery prior to submitting their affidavit.

46